AMERICAN TELEPHONE AND TELEGRAPH COMPANY, Plaintiff,

v.

The NEW YORK CITY HUMAN RESOURCES ADMINISTRATION and The City of New York, Defendants.

The CITY OF NEW YORK, Third–Party Plaintiff,

v.

NORTHERN TELECOM, INC., Third–Party Defendant.

No. 89 Civ. 4569 (PKL).

United States District Court, S.D. New York.

Sept. 7, 1993.

As Corrected Sept. 20, 1993.

Ordered Unsealed Oct. 6, 1993.

Kleinberg, Kaplan, Wolff & Cohen, P.C., New York City (David Parker, Monica L. Kaiser, of counsel), for American Tel. & Tel. Co.

O. Peter Sherwood, Corp. Counsel of City of New York, New York City (Barbara Yessel, Lewis S. Finkelman, of counsel), for City of New York.

Shearman & Sterling, New York City (Werner L. Polak, of counsel), for Northern Telecom, Inc.

## OPINION AND ORDER

LEISURE, District Judge:

This is an action in which American Telephone & Telegraph ("AT & T") seeks to recover unpaid long distance charges from the City of New York (the "City").[1] The

---

1. By Order and Opinion, dated May 2, 1990, this action was dismissed as against the New York City Human Resources Administration on the ground that it lacked the capacity to be sued.

City has impleaded Northern Telecom, Inc. ("Northern Telecom") as a third-party defendant, alleging that Northern Telecom, as the seller of the City's phone equipment, is liable for the long distance charges in dispute.

AT & T and Northern Telecom have filed separate motions for summary judgment against the City pursuant to Rule 56 of the Federal Rules of Civil Procedure. The City has brought a cross-motion for summary judgment against AT & T. For the reasons set forth below, AT & T's motion for summary judgment against the City is granted and the City's cross-motion for summary judgment against AT & T is denied. In addition, Northern Telecom's motion for summary judgment against the City is granted.

## BACKGROUND

On August 16, 1985, the City purchased a private branch exchange ("PBX") from Northern Telecom for three of the City's Human Resources Administration ("HRA") offices, including one located at 80 Lafayette Street in Manhattan. The PBX is part of HRA's Customer Premises Equipment which is under HRA's exclusive control and is not part of the public switchboard network. Its primary function is to connect HRA's internal telephone extensions, as well as to connect the offices' telephone system to outgoing trunk lines. HRA subscribed to AT & T's Long Distance Message Telecommunications Service ("LDMTS") under AT & T Tariff FCC No. 1 (the "Tariff") and, as a result, HRA's PBX was connected to AT & T's long distance service. Thus, long distance calls made from HRA's telephone numbers were carried over the AT & T network and the charges for such calls were billed to HRA.

From January to April 1986, Northern Telecom installed the PBX in a room at HRA's 80 Lafayette Street office (the "PBX room"). Northern Telecom trained certain HRA personnel, selected by the City, to operate the PBX. The PBX's operation was turned over to the City in or about April 1986.

Among other capabilities, a PBX can be equipped with a remote access feature which allows a PBX customer's selected off-premise employees to call their office's telephone number, enter a special code, and access outgoing trunk lines connected to their office's PBX. Many users of PBXs employ this feature to take advantage of the cost-savings that can be realized by having their employees make calls, including long distance calls, through a central system. The particular PBX licensed to the City and installed in HRA's 80 Lafayette Street office by Northern Telecom was *not* originally equipped with a remote access feature. However, as explained below, after the PBX's installation, it was manipulated by HRA employees to simulate such a remote access feature, enabling unauthorized off-premise callers to place long distance calls through HRA's PBX.

HRA's PBX was under the direct control of Gary Glaser, the Director of HRA's Division of Telecommunications Technologies, who supervised approximately twelve employees, including a technician named Everett Casazza. Casazza possessed a key to the PBX room and knew the password necessary to access the PBX.

After Northern Telecom turned the PBX's operation over to HRA, technician Casazza entered the PBX room and manipulated the PBX, which as originally installed by Northern Telecom did not have a remote access feature, so as to simulate such a feature. Glaser has admitted that he was aware of the modification to the PBX made by Casazza. Casazza created a "phantom phone" by programming into the PBX an extension number which did not correspond to any operating telephone at 80 Lafayette Street. Casazza then call forwarded this "phantom phone's" extension to the outgoing trunk lines connected to the PBX. These trunk lines were connected to AT & T's LDMTS. By this simulated remote access feature, an off-premise caller who called the HRA office at 80 Lafayette Street and entered the "phantom phone's" extension number would be forwarded to an outgoing trunk line, enabling the off-premise caller to dial long distance calls. As a result of these alterations to the system made by the HRA employee, any individual with knowledge of the "phantom phone" extension number could make interstate and international calls through HRA's

PBX. HRA, as the subscriber to AT & T's LDMTS, received the bill for any long distance calls placed through HRA's PBX by an off-premise caller.

After a series of events which are not pertinent to the resolution of the instant action, HRA's telephone number and the "phantom phone" extension were widely disseminated. As a result, HRA received a telephone bill in August 1987 for the sum of $352,142.42 and in September 1987 for the sum of $185,364.22 in connection with LDMTS charges.[2]

The City has refused to pay these LDMTS charges and AT & T has brought the instant suit to recover that sum pursuant to AT & T Tariff F.C.C. No. 1.[3] The City has brought a third-party action against Northern Telecom, the seller and installer of the PBX system, alleging that the unauthorized LDMTS calls were caused by a defect in Northern Telecom's PBX system which allowed unauthorized persons to exploit the remote access (*i.e.* "Direct Inward System Access" or "DISA") capability. The City has asserted claims for breach of contract, negligent design, negligent installation, and negligent failure to warn in connection with the PBX system. The City seeks to hold Northern Telecom liable for any LDMTS charges which the City must pay to AT & T relating to the unauthorized calls.

AT & T and the HRA have cross-moved for summary judgment in the main action, and Northern Telecom has moved for summary judgment against HRA's complaint in the third-party action.

## DISCUSSION

### I. STANDARD FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986); *Lang v. Retirement Living Publishing Co.*, 949 F.2d 576, 580 (2d Cir.1991). Accordingly, " '[s]ummary judgment is appropriate when, after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party.' " *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993) (quoting *Lund's, Inc. v. Chemical Bank*, 870 F.2d 840, 844 (2d Cir.1989)); *see also United States v. Certain Funds on Deposit in Scudder Tax Free Inv. Account # 2505103*, 998 F.2d 129, 131 (2d Cir.1993) ("In determining whether the moving party has satisfied this burden [on a summary judgment motion], the court must resolve all ambiguities in favor of the non-moving party and draw all reasonable inferences against the moving party."); *Cruden v. Bank of New York*, 957 F.2d 961, 975 (2d Cir.1992) ("The nonmovant's allegations are taken as true and it receives the benefit of the doubt when its assertions conflict with those of the movant."). The substantive law governing the case will identify those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and identifying which materials "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. at 2552. Once a motion for summary judgment is properly made, however, the burden then shifts to the non-moving party, which " 'must set forth specific facts showing that there is a genuine issue for

---

2. Casazza and Glaser pleaded guilty to federal charges of wire fraud and were sentenced to probation. The prosecution of two other HRA employees was deferred.

3. While the unpaid LDMTS charges equal $537,506.64, the Amended Complaint only seeks $529,000.

trial.'" *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (quoting Fed.R.Civ.P. 56(e)). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. at 2509–10 (emphasis in original). As the Second Circuit has noted, "[c]onclusory allegations will not suffice to create a genuine issue. There must be more than a 'scintilla of evidence,' and more than 'some metaphysical doubt as to the material facts.'" *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.,* 902 F.2d 174, 178 (2d Cir.1990) (quoting *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512 and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986)), *cert. denied,* ——— U.S. ———, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991). Thus, "[t]he non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990) (quotations omitted).

## II. AT & T'S MOTION FOR SUMMARY JUDGMENT

AT & T has moved for summary judgment asserting the following: (A) the Tariff which governs this dispute is unambiguous and requires judgment in its favor, (B) there are no material issues of fact as to "willful misconduct" by AT & T which would preclude summary judgment in favor of AT & T, (C) equitable considerations do not estop AT & T from asserting its rights under the Tariff, and (D) the City's allegation of an unreasonable discriminatory practice on the part of AT & T is not legally cognizable as an affirmative defense in the instant action. For the reasons articulated below, the Court finds that summary judgment in AT & T's favor is appropriate.

### A. ORIGINATION OF THE LDMTS CALLS

■ AT & T, as a carrier providing interstate telecommunication services, is governed by the provisions of the Communications Act of 1934. *See* 47 U.S.C. § 151 *et seq.* Section 203(a) of Title 47, United States Code, requires every carrier to file with the Federal Communications Commission ("FCC") tariffs "showing all charges for itself and its connecting carriers for interstate and foreign wire or radio communication ... and showing the classifications, practices, and regulations affecting such charges." It is clear from the case law in this area that these tariffs are not mere contracts, but rather have the force of law. *See Lowden v. Simonds–Shields–Lonsdale Grain Co.,* 306 U.S. 516, 520, 59 S.Ct. 612, 614, 83 L.Ed. 953 (1939) ("Until changed, tariffs bind both carriers and shippers with the force of law."); *Carter v. American Telephone & Telegraph Co.,* 365 F.2d 486, 496 (5th Cir.1966) ("[A] tariff, required by law to be filed, is not a mere contract. It is the law."), *cert. denied,* 385 U.S. 1008, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967); *see also Illinois Cent. Gulf R.R. Co. v. Golden Triangle Wholesale Gas Co.,* 586 F.2d 588, 592 (5th Cir.1978); *Southern Pac. Co. v. Brown, Alcantar & Brown, Inc.,* 409 F.2d 1331, 1332 (5th Cir.1969).

■ Further, these tariffs conclusively and exclusively enumerate the rights and liabilities of the contracting parties. *See American Telephone & Telegraph Co. v. Florida–Texas Freight, Inc.,* 357 F.Supp. 977, 979 (S.D.Fla.), *aff'd,* 485 F.2d 1390 (5th Cir.1973). Neither party disputes the fact that HRA, as a subscriber to AT & T's LDMTS, is bound by the conditions set forth in the Tariff. Section 2.4.1.A of the Tariff states as follows:

> The Customer is also responsible for the payment of bills for LDMTS. This includes payment for LDMTS calls or services:
>
> — *Originated at the Customer's number(s),*
>
> — Accepted at the Customer's number(s) (e.g., Collect Calls),
>
> — Billed to the Customer's number via Third Number Billing if the Customer is found to be responsible for such call or service, the use of a Calling Card, or the use of a Company-assigned Special Billing Number, and

— Incurred at the specific request of the Customer.

AT & T Tariff FCC No. 1, § 2.4.1.A (emphasis added), effective September 13, 1985 (Annexed as Exhibit I to the Affidavit of Barbara Yessel, Esq., sworn to on September 28, 1992 ("Yessel Affidavit")).

The City contends that the remote access LDMTS calls billed to HRA by AT & T did not "originate at" HRA's telephone number, as that term is defined by the Tariff. Rather, the City claims that these remote access LDMTS calls "originated at" the handset where the unauthorized off-premise caller dialed HRA's 80 Lafayette Street office and entered the "phantom phone's" extension. Therefore, the City argues that, under the terms of the Tariff, the City, as a matter of law, is not liable for the payment of LDMTS charges resulting from these unauthorized calls and is entitled to summary judgment in its favor.

In response and in support of its own motion for summary judgment, AT & T claims that the LDMTS calls billed to HRA, whether authorized or not, "originated at" HRA's PBX at 80 Lafayette Street. According to AT & T, even though the calls to HRA's PBX were made from the handset where the off-premise caller dialed the HRA number and the phantom phone's extension, the LDMTS calls "originated at" HRA's PBX, which is connected to outgoing long distance lines. AT & T asserts that the plain language of the Tariff requires HRA to pay for all LDMTS calls "originating at" HRA's PBX, whether authorized or not.

Both parties agree that granting summary judgment on this issue is contingent upon determining the "origination" of the LDMTS calls, as defined by the Tariff. The Court notes that there is one FCC case and several federal district court cases examining the customer's liability under the Tariff for these unauthorized calls.

In *Chartways Technologies, Inc. v. AT & T Communications*, 6 FCCRcd. 2952, 1991 FCC LEXIS 2992 (May 29, 1991) (Annexed as Exhibit A to the Memorandum of Plaintiff American Telephone and Telegraph Company in Support of Its Motion for Summary Judgment, dated July 27, 1992 ("AT & T Memorandum")), the Common Carrier Bureau of the FCC reaffirmed the longstanding principle holding a customer liable for all LDMTS calls made from the customer's phone system, including those made by unauthorized callers through a PBX's remote access feature. *Id.* at ¶ 13. In that case, Chartways Technologies, Inc. ("CTI"), had a remote access feature installed in its phone system which enabled off-premises callers to dial the PBX's telephone number, enter an access code, and access an outgoing long distance line. CTI, like the City in the instant case, was the victim of remote access fraud when unauthorized callers gained access to its PBX by using its remote access feature. The Chief of the FCC's Common Carrier Bureau held that, under the Tariff, CTI was responsible for the remote access LDMTS calls whether or not such calls were placed by authorized individuals. *Id.* at ¶¶ 12, 13; *see also American Message Centers v. Sprint Communications Co.*, (available on WESTLAW, FCom–FCC database), 1993 FCC LEXIS 4223, at ¶ 10 (August 17, 1993) (customer liable for unauthorized long distance calls under the Tariff). The Commission recently affirmed this ruling of the Common Carrier Bureau and found that the Tariff required payment by CTI of long distance charges associated with unauthorized calls placed through CTI's PBX. *See Chartways Technologies, Inc. v. AT & T Communications*, FCC 93–394 (August 19, 1993).

In light of the FCC's role in enforcing the provisions of the Tariff, this Court accords great deference to the FCC's determination that the Tariff includes unauthorized remote access calls made through a PBX. *See FCC v. WNCN Listeners Guild*, 450 U.S. 582, 598, 101 S.Ct. 1266, 1276, 67 L.Ed.2d 521 (1981) (" 'the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong....' ") (quoting *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969)); *see also Columbia Broadcasting Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 121, 93 S.Ct. 2080, 2095, 36 L.Ed.2d 772 (1973).

Several district courts have reached the same conclusion on this issue and found that unauthorized off-premise calls "originate at" the customer's number and, thus, the customer is liable for such charges. For example, in *American Telephone & Telegraph Co. v. ITT Consumer Fin. Corp.*, 3–89 Civ 374 (D.Minn. May 9, 1990), remote access LDMTS calls were made by unauthorized off-premise callers who gained access to ITT's PBX through its remote access feature. Granting plaintiff AT & T's motion for summary judgment, the court, interpreting the same Tariff term at issue in the instant case, held that owners of PBXs are liable for remote access calls placed through the PBX. The Court stated as follows:

> The language of the tariff is that when the LDMTS call originates from the customer's number, the customer is liable. The culprits here could only place unauthorized long distance calls once they accessed defendant's LDMTS service. And defendant's number was recorded for billing purposes only when the long distance portion of the call was initiated. It does not seem to the Court that it defies common sense to say that, however a customer's number is accessed, an [sic] LDMTS call begins at the customer's number, and that therefore [AT & T's] interpretation is reasonable.

Bench Opinion, at 13 (Annexed as Exhibit A to Reply Memorandum of AT & T in Support of Summary Judgment Motion and in Opposition to Defendant's Cross–Motion for Summary Judgment, dated December 11, 1992 ("AT & T Reply Memorandum")).

In *Industrial Leasing Corp. v. GTE Northwest Inc.*, 818 F.Supp. 1372 (D.Or. 1992), Industrial Leasing Corp. ("ILC") was the victim of remote access fraud when unauthorized off-premise callers accessed ILC's PBX and placed long distance calls. The court dismissed ILC's motion seeking a declaratory judgment that it was not liable for such calls on the grounds that, *inter alia*, the calls did not "originate" from ILC as defined in the relevant tariffs. The court stated:

> [L]iability for long distance charges depends upon where access to the AT & T

long distance line originates. I agree with AT & T that ILC's long distance service originates with the GTE system [the PBX], through which all of ILC's long distance calls start. While clearly ILC "specifically requested" that the calls be made, the tariff allows billing for calls originating at ILC's numbers, and therefore unambiguously applies to the charges incurred through unauthorized access to the communications system purchased by ILC from GTE.

818 F.Supp. at 1374–75.

In *American Telephone & Telegraph Co. v. Pacific Mutual Life Ins. Co.*, CV 91–6793–IH (C.D.Cal. Oct. 30, 1992) [4], summary judgment for AT & T was granted in an action involving long distance charges resulting from the unauthorized remote access use of Pacific Mutual Life Insurance Company's ("Pacific") PBX. The court rejected Pacific's claim that the term in the Tariff stating that customers are responsible for all calls which "originated at" their telephone numbers is ambiguous, stating:

> Given our facts, I must tell you that I don't think the term in question, "originated at the customer's number" has any ambiguity in it.
>
> The facts show that these long distance calls originated and resulted from their having passed through the PBX system at defendant customer's place of business.
>
> . . . .
>
> But for the secret code being punched in at the outside place, and as a result of it being punched in, the switching that took place on the customer's premises would not have occurred, and these long distance calls could not have taken place.
>
> So in my tentative view, as far as I'm concerned, there is no ambiguity at all on the matter of where these calls originated. They originated at the defendant Pacific Mutual's phones and phone number.

Bench Opinion, at 17–18, 27 (Annexed as Exhibit B to AT & T Reply Memorandum).

Finally, in *American Telephone & Telegraph Co. v. Jiffy Lube Int'l, Inc.*, 813

4. [Deleted]

F.Supp. 1164 (D.Md.1993), the court granted AT & T's motion for summary judgment, rejecting Jiffy Lube's claim that the LDMTS calls made by unauthorized callers using Jiffy Lube's remote access feature did not "originate at" the PBX. Interpreting the same Tariff term at issue in the instant action, the court stated:

There is no genuine factual dispute as to the meaning of the Tariff, and specifically there is no question concerning the applicable meaning of the word "originated" as used in the Tariff. Indeed, the meaning of the Tariff is unambiguous. The Tariff squarely places responsibility upon a customer such as Jiffy Lube for calls, whether or not authorized, which "originated" at the customer's number. Herein, the calls at issue originated at Jiffy Lube's number, that is, at Jiffy Lube's PBX which was at Jiffy Lube's Baltimore office. Thus, in a case like this one, the word "originated" means that the calls in issue originated at Jiffy Lube's number when, after the "computer hacker" dialed the MCI 800 number and after the hacker reached that number and dialed the code "LUBE," the hacker was thereby able to access the AT & T long distance line running out of Jiffy Lube's Baltimore office.

813 F.Supp. at 1167.

■ While the City argues that it is not responsible for remote access LDMTS calls billed to HRA's PBX, all the above cited cases reaffirm well settled law that, under the Tariff, a customer is responsible for all calls placed from his or her telephone number, whether authorized or not. The Court agrees with the highly persuasive analysis of the above cited cases and finds that the meaning of the phrase "originated at" contained in the Tariff is clear and unambiguous under the circumstances of the instant case. The plain meaning of the Tariff requires the Court to conclude that remote access calls placed through a PBX's remote access feature "originate at" that PBX. Accordingly, in the instant case, the Court finds that the remote access LDMTS calls billed to HRA's PBX, whether authorized or not, "originated at" HRA's number.

■ While the City has offered evidence in support of its contention that the unauthorized calls at issue here did not "originate at" HRA's PBX under the Tariff, the evidence set forth by the City clearly does not raise a material issue of fact on this issue. First, the City argues that the AT & T Office Practice manual recognizes that the remote access calls do not "originate at" a customer's number but merely "appear to" do so. The manual states in pertinent part as follows:

it will *appear to* the Network and the billing system as though the [remote access] call originated at the customer's location.

AT & T Office Practice Manual, dated July 1987 (Annexed as Exhibit J to the Yessel Affidavit) (emphasis added). In addition, the City points to the deposition of a Corporate AT & T Security Manager who described the unauthorized remote access calls billed to HRA as "off-premises originated calling." Deposition of Thomas P. Maher, dated December 20, 1990, at 111 ("Maher Deposition") (Annexed as Exhibit O to the Yessel Affidavit).

The Court finds that the Office Practice manual and the statement in the Maher Deposition merely represent unartful descriptions of the highly technical aspects of remote access fraud and do not constitute legally controlling interpretations of the Tariff term in the instant action. Common sense and the relevant case law clearly indicate that the plain language of the Tariff term "originated at" must be interpreted to mean that remote access calls, whether authorized or not, placed through a PBX originate at that PBX. Therefore, since the language of the Tariff is clear and unambiguous, the Court concludes that this extrinsic evidence does not create an issue of fact as to the meaning of the phrase "originated at."

Finally, the Court notes that adopting the City's interpretation of the Tariff would lead to a nonsensical result in cases where a remote access feature is a legitimate part of a PBX. If a remote access call were held to "originate at" the off-premise handset, *authorized* off-premise callers would escape paying for their LDMTS calls made using their PBX's remote access feature. Under

the City's interpretation of the Tariff, these remote access LDMTS calls would be billed to the off-premise handset's telephone number rather than to the PBX's telephone number. This interpretation of "originated at" would enable those with a PBX with a remote access feature to escape paying for authorized LDMTS calls placed through their own PBX. In sum, the Court finds that, under the Tariff's clear and unambiguous language, the LDMTS calls in dispute in the instant action "originated at" HRA and summary judgment in AT & T's favor on this issue is appropriate.

## B. AT & T'S LIABILITY UNDER THE TARIFF FOR WILLFUL MISCONDUCT

### (1) Standard of Willful Misconduct

As a matter of law, the Tariff limits AT & T's liability to its subscribers except in instances of willful misconduct. The Tariff provides in pertinent part as follows:

> The Company's liability, if any, for its willful misconduct is not limited by this tariff.

AT & T Tariff FCC No. 1, § 2.3.1(A), effective December 2, 1986 (Annexed as Exhibit I to the Yessel Affidavit).[5] Courts have found that "[w]illful misconduct, if proven, discharges liability under the tariff." *MCI Telecommunications Corp. v. Management Solutions, Inc.*, 798 F.Supp. 50, 52 (D.Me. 1992) (citing *MCI Telecommunications Corp. v. TCI Mail, Inc.*, 772 F.Supp. 64, 67 (D.R.I. 1991)). The City argues that there are issues of fact as to whether AT & T's actions or omissions with respect to the disputed LDMTS calls billed to HRA constituted "willful misconduct" and, thus, precludes summary judgment in AT & T's favor.

Willful misconduct has been defined as: *the intentional performance of an act with knowledge that the performance of that act will probably result in injury or damage,*

*or it* may be the intentional performance of an act in such a manner as to imply reckless disregard of the probable consequences ..., [or] the intentional omission of some act, *with knowledge that such omission will probably result in damage or injury, or the intentional omission of some act* in a manner from which could be implied reckless disregard of the probable consequences of the omission....

*Berner v. British Commonwealth Pac. Airlines, Ltd.*, 346 F.2d 532, 536–37 (2d Cir.1965) (quotation omitted and emphasis in original), *cert. denied*, 382 U.S. 983, 86 S.Ct. 559, 15 L.Ed.2d 472 (1966). In order for AT & T to succeed on its motion for summary judgment, the Court must determine that, viewing all of the evidence in the light most favorable to the City, there is no genuine issue of material fact as to whether AT & T engaged in willful misconduct with respect to the remote access LDMTS calls billed to HRA.

■ Summary judgment may be properly granted even where the issue, as it is in the instant action, is one of motivation or intent. *See, e.g., Oliver v. Digital Equip. Corp.*, 846 F.2d 103, 109 (1st Cir.1988) (summary judgment can be appropriate even when case involves an issue of motivation); *White v. Hearst Corp.*, 669 F.2d 14, 17 (1st Cir.1982) ("[A] party against whom summary judgment is sought is [not] entitled to a trial simply because he has asserted a cause of action to which state of mind is a material element. There must be some indication that he can produce the requisite quantum of evidence to enable him to reach the jury with his claim.") (quotation omitted); *Caslin v. General Elec. Co.*, 696 F.2d 45, 47 (6th Cir.1982) ("Though questions of motive and intent are jury questions, where there is no evidence of unlawful motive or intent, there is nothing to submit [to the jury].").

---

5. It has been long recognized that a limitation on liability serves the public interest by lowering the utility's rate. *See Western Union Telegraph Co. v. Esteve Bros. & Co.*, 256 U.S. 566, 571, 41 S.Ct. 584, 586, 65 L.Ed. 1094 (1921) (Brandeis, J.) ("The limitation of liability [is] an inherent part of the rate."); *Pilot Indus. v. Southern Bell Telephone & Telegraph Co.*, 495 F.Supp. 356, 361 (D.S.C.1979) (" '[I]t is to the public interest to

have uninterrupted service at a reasonable price, it necessarily follows that a reasonable limitation of liability for damages for interrupted telephone service may be considered as a part of the telephone ratemaking function.' ") (quoting *Southern Bell Telephone & Telegraph Co. v. Invencheck, Inc.*, 130 Ga.App. 798, 800, 204 S.E.2d 457, 460 (1974)).

## (2) *No Evidence of AT & T Engaging in Willful Misconduct*

The Court finds that the City has failed to allege or present evidence to suggest that AT & T's actions, with respect to the remote access LDMTS calls billed to HRA, which would preclude summary judgment in AT & T's favor on the issue of willful misconduct. First, there is no evidence in the record from which a reasonable trier of fact could find that AT & T, upon discovering the possibility of remote access fraud at HRA, made affirmative misrepresentations to HRA regarding the problem or intentionally omitted to notify HRA. To the contrary, the evidence clearly indicates that AT & T, upon discovering a high-volume of calls from HRA's telephones, immediately acted to warn the proper HRA personnel. *See* Abnormal Usage Report (Annexed as Exhibit F to the Yessel Affidavit). AT & T's Abnormal Usage Report indicates that AT & T became aware of a high-volume of LDMTS calls from HRA's telephone numbers on August 11, 1987. The report also indicates that AT & T informed HRA personnel of the high-volume of LDMTS calls on August 12, 1987. The evidence before this Court, *without exception*, indicates that AT & T took deliberate and appropriate actions to rectify the remote access fraud at HRA, not to cause or perpetuate injury or damage to the City. Thus, the Court finds no allegation, or any evidence, that could lead a reasonable trier of fact to infer that AT & T intentionally or recklessly failed to notify HRA of the remote access fraud at its PBX, once the fraud was discovered by AT & T.[6]

Courts faced with claims of liability analogous to those made by the City in the instant case have granted summary judgment to the carrier, in the absence of evidence suggesting that the carrier engaged in willful misconduct. For example, in *Stand Buys, Ltd. v. Michigan Bell Telephone Co.*, 646 F.Supp. 36 (E.D.Mich.1986), the court granted summary judgment for Michigan Bell Telephone Company ("Michigan Bell"), concluding that there was no evidence of willful misconduct on its part. In that case, Stand Buys, Ltd. ("Stand Buys") alleged that Michigan Bell intentionally interrupted service, delayed repairs and made affirmative misrepresentations regarding the installation and maintenance of the plaintiff's phone. Stand Buys also pointed to statements from AT & T employees, who assisted in the installation of the phone system, characterizing the installation as "messed up." Despite these allegations and statements, the court held that Stand Buys had not established a genuine issue of material fact as to whether Michigan Bell engaged in willful misconduct. The court stated:

> These statements, when viewed in a light more favorable to plaintiff, provide no evidence at all of any intentional misconduct by defendants. At most, it shows negligence. There is absolutely nothing before the court which might suggest that defendants' conduct toward plaintiff was intentional.

*Id.* at 39; *see also Pilot Indus.*, 495 F.Supp. at 364 (granting summary judgment in favor of Southern Bell, since its failure to correct service interruptions to plaintiff's phone system and the problem with plaintiff's telephone directory listing did not constitute willful misconduct).[7]

---

6. While there are no allegations or evidence suggesting that AT & T engaged in willful misconduct *once the problem at HRA was discovered*, the City does allege that AT & T knew that the remote access fraud was a serious problem among customers prior to the occurrence of the fraud at HRA and should have warned the City of this potential problem. However, as discussed *infra*, no such general duty to warn exists and, in any event, the failure to warn prior to the discovery of the fraud would not rise to the level of willful misconduct in the instant case.

7. Similarly, in *Video Educ. Career Inst. v. American Telephone & Telegraph Co.*, Civ. A. No. 88–1721–N, 1990 WL 137297 (D.Mass. January 5, 1990), Magistrate Judge Robert B. Collings determined that the plaintiff was unable to show that AT & T's failure to correct problems in its phone system rose to the level of willful misconduct and recommended granting summary judgment in favor of AT & T. In that case, AT & T made several affirmative representations to the plaintiff that it would immediately correct the problems in the plaintiff's phone system. *Id.* at *4–5. The court concluded that AT & T's failure to immediately correct the phone system's problems did not constitute willful misconduct and, at most, amounted to "ordinary negligence." *Id.* at *8.

While in *MCI Telecommunications Corp. v. Management Solutions, Inc., supra,* the Court denied summary judgment to MCI in the context of a remote access fraud, that case is clearly distinguishable from the instant case. In *MCI Telecommunications Corp.,* the customer, Management Solutions, Inc. ("Management Solutions"), notified MCI representatives of unauthorized calls on its PBX. 798 F.Supp. at 52. MCI then advised Management Solutions that the problem with respect to the unauthorized charges "was being" or "would be taken care of" and then failed to take affirmative action to follow up on these representations. *Id.* at 50. The court held that there was a genuine issue of material fact as to whether MCI's affirmative representations to correct the problem and subsequent failure to follow-up on those representations constituted willful misconduct. *Id.*

In the instant case, however, the City has neither alleged, nor presented any evidence, which suggests that AT & T knew about the remote access fraud occurring at HRA or made affirmative representations that the problem at HRA would be corrected. Instead, the undisputed evidence indicates that AT & T immediately informed HRA of the high-volume of LDMTS calls from HRA's telephone number once it was discovered. Therefore, drawing all reasonable inferences in the City's favor, the Court finds that the City has failed to raise a genuine issue of material fact as to whether AT & T engaged in willful misconduct with respect to the LDMTS calls billed to HRA.

### (3) *AT & T's Knowledge of Past Instances of Remote Access Fraud*

As noted above, unlike the defendant in *MCI Telecommunications Corp.,* the City does not allege or present evidence to suggest that AT & T, either by its actions or omissions, intentionally sought to cause damage or injury to the City upon discovery of the remote access fraud at HRA. Instead, the City simply points to recurring instances of remote access fraud involving other customers and argues that AT & T's failure to warn the City about this problem prior to the occurrence of the fraud is evidence of willful misconduct. Specifically, the City alleges that AT & T had:

> overwhelming, detailed knowledge of the remote access fraud epidemic which began relentlessly attacking its long distance customers at least eight years before the fraud at HRA. It is undisputed that AT & T began monitoring calls to what it had identified as three high—fraud countries (Colombia, the Dominican Republic and Pakistan) in 1986; that every week AT & T calculated the thousands of minutes of probably fraudulent calls to those countries; that AT & T was aware of approximately 250 PBX toll fraud incidents in the year before the fraud at HRA; that AT & T knew that remote access frauds are "standard problems with a big PBX"; and that remote access had even occurred at AT & T's own offices.

Memorandum of Law in Opposition to Motion of AT & T for Summary Judgment and in Support of Cross–Motion for Summary Judgment, dated September 25, 1992 ("City's Opposition to AT & T"), at 17–18 (citations and footnote omitted). The City argues that the recurrence of remote access fraud and AT & T's knowledge of its existence imposes a general duty upon AT & T to warn its LDMTS customers of the possibility of unauthorized access to their PBXs before any such fraud occurs.

AT & T does not contest, for purposes of this motion, that it knew of the general susceptibility of PBXs to remote access fraud prior to the incident at HRA. *See* AT & T Memorandum, at 13 ("Rather than burden the Court with factual issues with respect to this matter, AT & T will assume for the purposes of this motion that it was aware of remote access fraud before, and provided no material on remote access fraud to its customers until after, the calls in question were made."). Instead, AT & T argues that it has no general duty to warn under the Tariff and that the failure to warn customers, prior to the discovery of the fraud, does not create an issue of fact as to "willful misconduct" by AT & T. As discussed in detail below, the Court agrees with AT & T on this issue and finds that no general duty to warn exists in this context.

First, the repeated occurrence of remote access fraud does not create a general duty on AT & T's part to warn its LDMTS customers of the possibility of unauthorized access to their PBX because the applicable Tariff does not impose such a duty. The conclusive and exclusive rights and liabilities of carriers are enumerated in their tariffs. *See Clemente v. Philippine Airlines,* 614 F.Supp. 1196, 1199 (S.D.N.Y.1985) (" 'The tariffs are both conclusive and exclusive; they may not be added to through reference to outside contracts or agreements or understandings or promises.' ") (quoting *North Am. Philips Corp. v. Emery Air Freight Corp.,* 432 F.Supp. 519, 524 (S.D.N.Y.1977) (quotation omitted)), *aff'd,* 579 F.2d 229 (2d Cir.1978)); *American Telephone & Telegraph Co. v. Florida–Texas Freight, Inc.,* 357 F.Supp. 977, 979 (S.D.Fla.1973) ("It is also clear that tariffs validly filed in accordance with 47 U.S.C. § 203 operate to conclusively and exclusively control the rights and liabilities between the parties."), *aff'd,* 485 F.2d 1390 (5th Cir.1973). The Tariff applicable to the instant action does not place a duty upon AT & T to warn its LDMTS customers of the possibility of remote access fraud nor does the City provide any argument as to how the Tariff imposes such a duty. Therefore, the Court finds that, under the Tariff, AT & T did not have, and consequently did not abrogate, any duty to warn HRA of the possibility of unauthorized use of its PBX.

In *Chartways Technologies, Inc., supra,* the FCC reached the same conclusion. In *Chartways,* CTI, the victim of the remote access fraud, argued that AT & T was aware that remote access fraud was a "common and growing problem," but never attempted to advise the customer of the potential problem or provide methods of preventing such abuses. 1991 FCC LEXIS 2992, at ¶ 5. The Common Carrier Bureau rejected this argument and found the customer liable for the unauthorized calls resulting from the remote access fraud. In affirming the Common Carrier Bureau's finding, the Commission emphasized that "CTI fails to cite any authority or provide a persuasive argument to support its contention that AT & T had, at the time these fraudulent calls occurred, an affirmative duty to warn CTI about toll fraud risks." [8] *Chartways Technologies, Inc.,* FCC 93–394, at ¶ 16.

Second, in deciding that AT & T has no general duty to warn, this Court also finds compelling the fact that AT & T did not sell, install or service HRA's PBX. The PBX was part of HRA's Consumer Premises Equipment, under HRA's exclusive control and not part of the public switchboard network. HRA decided to connect its PBX to the regulated public switchboard network, thereby providing callers with the ability to utilize that network. There is no indication in the record that AT & T had the ability or authority to control, secure or restrict access to HRA's PBX. AT & T played no role in the selection or implementation of that equipment, but rather simply provided the long distance services that could be accessed through the remote access feature. It is untenable for the City to argue, under these circumstances, that AT & T's failure to warn

---

8. While in *Industrial Leasing Corp.,* 818 F.Supp. at 1375, the court allowed the plaintiff to amend its negligence claims to plead specific allegations of duties placed upon AT & T outside the tariffs, the Court disagrees with that decision to the extent that it suggests that AT & T may have duties which exist independent of the Tariff. In *Jiffy Lube Int'l, Inc., supra,* the court noted the amendment to the pleading allowed in *Industrial Leasing Corp.* and stated "[w]ith all due deference to the District of Oregon, in this Court's view, such arguments are better put to the FCC, the federal agency charged with promulgating and interpreting tariffs." 813 F.Supp. at 1164. The court added that "[t]he FCC, not the district courts, should, as the agency with the expertise in the communications arena, weigh such considerations." *Id.*

The Court emphasizes that, if legal protection from the liability which ensues from remote access fraud is required for telephone customers, it is the role of the FCC or Congress to implement such obligations upon AT & T, not the courts. The Court cannot create a duty to warn when no such duty exists under the Tariff. The Court notes that the FCC is in the process of addressing the broad policy questions related to toll fraud abuse. *See Chartways Technologies, Inc.,* FCC 93–394, at ¶ 8 n. 21 (noting that the Commission has opened a "general record" on toll fraud which includes the viewpoints of panelists representing telecommunications users, carriers, equipment vendors, law enforcement organizations and others).

them of prior instances of remote access fraud constituted willful misconduct. *See American Telephone & Telegraph Co. v. ITT Consumer Fin. Corp.*, 3–89 Civ. 374, at 15–16 ("The Court finds persuasive the facts that AT & T had no connection with or responsibility for the PBX equipment installed by the defendant and used by off-premise callers to make unauthorized calls; that AT & T had no capability to restrict access to or egress from ITT's PBX; and that AT & T had no power to change the access code for the remote access feature or to disable it entirely. The Court agrees with plaintiff [AT & T] that the power to prevent or control unauthorized calls made through the remote access feature of ITT's PBX was solely in the hands of the defendant.") (Annexed as Exhibit A to AT & T Reply Memorandum); *see also Jiffy Lube Int'l, Inc.*, 813 F.Supp. at 1167 ("Jiffy Lube ignores the fact that it created the vehicle and mechanism by which those long distance calls became possible"); *Chartways Technologies, Inc.*, FCC 93–394, at ¶ 16 ("We think it significant that CTI, with the assistance of Northern Telecom, installed CTI's PBX system without consulting AT & T in any way and that this equipment then provided the point of vulnerability to fraudulent calling.").

■ In sum, the Court rejects the City's contention that prior cases of remote access fraud reported by other LDMTS customers creates a general duty to warn customers before such a problem occurs. Moreover, even if a general duty to warn the City existed prior to the occurrence of the problem at HRA, AT & T's failure to do so would, *at best*, constitute mere negligence and, on the record before the Court, could not give rise to an inference of willful misconduct on the part of AT & T with respect to the remote access fraud at HRA. *See Pilot Indus.*, 495 F.Supp. at 364 (" 'A plaintiff cannot establish intentional and deliberate conduct within the tariffs [sic] exception to the limitation on liability merely by showing a series of negligent acts.' ") (quoting *Olson v. Mountain States Telephone & Telegraph Co.*, 119 Ariz. 321, 323, 580 P.2d 782, 784 (1978) (citations omitted)). Viewing all of the evidence in the light most favorable to the City, the Court finds that as a matter of law the City

has failed to raise a genuine issue of material fact regarding whether AT & T engaged in willful misconduct with respect to the LDMTS calls billed to HRA.

## C. PRINCIPLES OF EQUITY

■ The City claims that principles of equity estop AT & T from asserting the terms of the filed Tariff to hold the City liable for the unauthorized LDMTS calls. Such a contention is contrary to the well-settled law in this area.

Courts have uniformly refused to apply principles of equity to estop the enforcement of terms in a filed tariff. Courts addressing this issue in the context of filed tariffs under the Interstate Commerce Act ("ICA"), 49 U.S.C. §§ 10101–11917, have held that equitable considerations simply do not apply in cases involving the collection of charges under a tariff. *See Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 126–27, 110 S.Ct. 2759, 2765–66, 111 L.Ed.2d 94 (1990) (Interstate Commerce Act's "filed rate doctrine" forbids equitable defenses to the collection of the filed tariff); *Illinois Central Gulf R.R. Co.*, 586 F.2d at 592 ("Equitable considerations cannot justify a carrier's failure to collect authorized tariff charges, nor can they be invoked as the basis for an estoppel to collect such charges.") (citation omitted); *Locust Cartage Co. v. Transamerican Freight Lines, Inc.*, 430 F.2d 334, 343 (1st Cir.1970) ("a carrier can recover undercharges from a shipper regardless of contrary agreement, misquotation by the carrier, reliance, or other equitable defense"), *cert. denied*, 400 U.S. 964, 91 S.Ct. 365, 27 L.Ed.2d 383 (1970); *Alleghany Corp. v. Romco, Inc.*, 392 F.Supp. 38, 40 (W.D.Pa. 1975) ("no defenses such as estoppel by conduct of the carrier, reliance by the shipper, innocence of the shipper; hardship on the shipper, [or] agreement of the parties may avail a shipper" from having to pay the full charges stated in the tariff); *Union Pac. R.R. Co. v. Higgins*, 223 F.Supp. 396, 401 (D.N.D.1963) ("a carrier cannot waive or be estopped from collecting full charges prescribed by published tariffs").

■ This rule is often referred to as the "filed tariff doctrine." While these cases deal with the ICA, the rationale underlying these decisions clearly applies to tariffs under the Communications Act. *See MCI Telecommunications Corp. v. FCC,* 917 F.2d 30, 38 (D.C.Cir.1990) ("The Communications Act, of course, was based upon the ICA and must be read in conjunction with it."); *American Broadcasting Cos. v. FCC,* 643 F.2d 818, 820–21 (D.C.Cir.1980) ("To understand the purposes of the Communications Act ... we must look to the legislative history of the Interstate Commerce Act of 1887, for the Communications Act borrowed its language and purpose from the Interstate Commerce Act.").

The Supreme Court in the context of the ICA has explained the rationale underlying the filed tariff doctrine:

If the rates are subject to secret alteration by special agreement, then the statute will fail of its purpose to establish a rate duly published, known to all, and from which neither shipper nor carrier may depart.... Any other construction of the statute opens the door to the possibility of the very abuses of unequal rates which it was the design of the statute to prohibit and punish.

*Armour Packing Co. v. United States,* 209 U.S. 56, 81, 28 S.Ct. 428, 435, 52 L.Ed. 681 (1908); *see also Siegel v. Converters Transp., Inc.,* 714 F.2d 213, 215 (2d Cir.1983) (" '[t]his rule is undeniably strict and it obviously may work hardship in some cases' but ... strict liability 'embodies the policy which has been adopted by Congress in the regulation of interstate commerce in order to prevent unjust discrimination.' ") (quoting *Louisville & Nashville R.R. v. Maxwell,* 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915)).

This "filed tariff doctrine" was applied to the Communications Act of 1934, 47 U.S.C. §§ 151–613, in *Marco Supply Co. v. AT & T Communications, Inc.,* 875 F.2d 434 (4th Cir. 1989). In that case, Marco Supply Company ("Marco") entered into a contract with AT &

T for the installation of a computer-telephone network, based on AT & T's written and oral representations regarding the installation and the monthly service rates. Marco was subsequently billed at a rate higher than the rate originally quoted by AT & T. *Id.* at 435. AT & T informed Marco that the quoted prices were erroneous and, instead, Marco would be billed at the rates established by the applicable tariff filed with the FCC. *Id.* Marco filed an action against AT & T charging it with breach of contract and negligent and willful misrepresentation. The Fourth Circuit affirmed the District Court's dismissal of Marco's complaint, stating that:

Marco's problem in this case is that while it may have equity on its side, the law is against it. The general case law is that a regulated carrier *must* charge the tariff established with the appropriate regulatory agency, even if it has quoted or charged a lower rate to its customer.

*Id.* at 436; *see also MCI Telecommunications Corp. v. TCI Mail, Inc.,* 772 F.Supp. 64, 67 (D.R.I.1991).

■ While recognizing the potential for abuse, the Court finds the rationale underlying the filed tariff doctrine compelling and applicable to the Communications Act. Accordingly, the Court finds that the City is precluded from asserting principles of equity to estop AT & T from asserting its rights under the Tariff.[9]

■ Even if the Court were to employ its general equitable powers to the circumstances of the instant case, the Court would find that the equities favor AT & T and that AT & T should not be estopped from asserting its rights under the Tariff. As noted earlier, AT & T did not sell or install HRA's PBX, have knowledge that HRA had a PBX with a simulated remote access feature connected to a long distance line, or have the power to control, secure or restrict access to HRA's PBX. *See American Telephone & Telegraph Co. v. Pacific Mutual Life Ins. Co.,* CV 91–6793–IH, at 14 ("The equities here are, in my view, very strong in favor of

---

9. Of course, the "filed tariff doctrine," would not preclude the City from avoiding charges by proving "willful misconduct" by AT & T pursuant to the Tariff. *See MCI Telecommunications Corp.,*

772 F.Supp. at 68–69. However, as discussed earlier, the City has failed to raise a material issue of fact as to AT & T's alleged willful misconduct.

AT & T. AT & T could do nothing to protect itself from these charges. Whereas the customer, with a little more due care, might well have prevented these charges from happening at all by frequent changing of the so-called secret code number, as it had a right to do, and also by noticing the high volume of the after-hours calls and the South American destinations sooner. The risk of loss under those circumstances in terms of equity, properly should be on the customer...") (Annexed as Exhibit B to AT & T Reply Memorandum).[10] The City has provided no rationale for requiring AT & T to warn HRA, secure access to HRA's PBX, closely monitor the PBX's use, and implement internal controls to thwart HRA's own employees from manipulating the PBX. In sum, the Court finds that the equities do not estop AT & T from asserting its rights under the Tariff.

## D. UNREASONABLE DISCRIMINATION

■■■ The City alleges that AT & T has engaged in a discriminatory practice by favoring customers who purchase AT & T equipment over customers, such as the City, who purchase their phone equipment from AT & T's competitors. According to the City, AT & T favors AT & T phone equipment customers who have been the victim of remote access fraud by entering into settlement agreements with them for amounts less than the full LDMTS bill or by allowing the statute of limitations to run on the collection of the LDMTS bill. By contrast, AT & T is demanding full payment for the LDMTS charges billed to HRA, which purchased its PBX from AT & T's competitor, Northern Telecom. The City contends that AT & T's disparate treatment of customers who purchase their phone equipment from AT & T's competitor amounts to unreasonable discrimination in violation of 47 U.S.C. § 202(a). The City claims such discriminatory practice estops AT & T from asserting its rights under the terms of the Tariff in the instant case. Having considered this argument, the Court finds that regardless of whether AT &

T in fact discriminates in the manner alleged by the City, such a practice does not afford the City with an affirmative defense to AT & T's summary judgment motion as to the collection of the LDMTS charges in the instant case.

The Communication Act provides in pertinent part as follows:

It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

47 U.S.C. § 202(a).

■■■ Assuming that the City could demonstrate unlawful discrimination, the City must allege, and provide evidence of, an injury from the discrimination in order to have a cognizable claim under Section 202(a). In other words, the City must show that its pecuniary damages would have been less if AT & T had collected the full tariff rate from the customers with whom AT & T has allegedly settled. *See I.C.C. v. United States ex rel. Campbell,* 289 U.S. 385, 390, 53 S.Ct. 607, 610, 77 L.Ed. 1273 (1933) ("The question is not how much better off the complainant would be today if it had paid a lower rate. The question is how much worse off it is because others have paid less."); *In re Exchange Network Facilities for Interstate Access,* 1 FCCRcd. 618, 1986 LEXIS 2336, at ¶ 69 (November 14, 1986) ("[t]he measure of damages is not the difference between the discriminatory rate to customers and a just and reasonable rate, but actual damage to the complainant by virtue of the unlawful preference, or profits lost because of the ability of the favored customer, or profits lost because of the ability of the favored customer

---

10. In *Pacific Mutual Life Ins. Co.,* while the Court commented on the equities, it emphasized that it was not deciding the case on the equities but rather was "required to decide it on the basis

of the tariff, the contract law, and the meaning and affect of tariffs and rates as governed by the FCC Act and the Commission." *Id.*

to control the market price of complainant's goods or services"); *see also In re Illinois Bell Telephone Co.,* 4 F.C.C.Rcd. 5268, 1989 FCC LEXIS 988, at ¶¶ 10–11 (June 13, 1989) ("[i]n order to recover damages under Section 202(a), a complainant must be capable of showing that it actually was damaged by virtue of the unlawful discrimination or preference proscribed by that Section" and, thus, failure to allege damages warrants dismissal of such a claim).

■ In the instant case, the City has not alleged that HRA or the City was damaged by AT & T's alleged discrimination and, in any event, the Court finds that there is absolutely no evidence to support such an allegation. Although the City argues that AT & T's alleged discriminatory practice estops AT & T from collection of the charges under the Tariff, the City has provided no case law to support that novel contention.

In *In re Chesapeake and Potomac Telephone Co. of Maryland,* 2 FCCRcd. 3528, 1987 FCC LEXIS 3718 (June 12, 1987), *vacated as moot,* 3 FCCRcd. 748, 1988 FCC LEXIS 97 (February 18, 1988), the Hecht Company ("Hecht") charged Chesapeake and Potomac Telephone Company of Maryland ("C & P") with retaliating against Hecht for its purchase of a PBX from C & P's competitor by changing the tariff under which Hecht was billed for telephone services. The new tariff charged Hecht a higher price for telephone services. The FCC held that regardless of C & P's alleged discriminatory practice in violation of section 202(a), Hecht could not refuse to pay for its telephone service under the higher priced tariff. The FCC held as follows:

> Assuming arguendo that C & P has followed a practice of billing mixed use facilities at state tariff rates and changed Hecht's billing for retaliatory purposes. [sic] Hecht would still be required to pay the charge in the applicable tariff. It can-

not avoid the lawful charge merely because others may have been billed incorrectly. *Id.* at ¶ 36.

■ Thus, the Court finds that forfeiture of the charges under the Tariff is not a proper remedy for unlawful discrimination under section 202(a). Instead, the proper remedy for such discrimination is the amount of damages caused to the City as a result of the unlawful discrimination. As noted above, the City has not alleged, nor is there any evidence of, damages flowing from AT & T's alleged discriminatory conduct in settling charges from remote access frauds with other customers. Therefore, the City has no claim under section 202(a). The Court rejects the City's argument that the mere existence of a discriminatory practice, without any damages to the City, estops AT & T from collecting the LDMTS charges under the Tariff. Accordingly, section 202(a) does not constitute a defense to the LDMTS charges sought by AT & T in the instant case and summary judgment on this issue in AT & T's favor is appropriate.[11]

In sum, having considered all of the arguments of AT & T and the City in light of the entire record, the Court concludes that, under the Tariff's clear and unambiguous language, the City is liable for the unpaid LDMTS calls billed to HRA. The City has failed to raise a genuine issue of material fact which would preclude summary judgment in AT & T's favor in the instant case based upon the Tariff.

### III. NORTHERN TELECOM'S MOTION FOR SUMMARY JUDGMENT

The City has impleaded Northern Telecom, as the seller and installer of the SL–1 PBX system at HRA, and asserted claims of negligence and breach of contract seeking reimbursement for the money allegedly owed to AT & T for the LDMTS calls which resulted from the remote access fraud at HRA. Northern Telecom has moved for summary

---

11. The Court's finding on this issue does not preclude the City from filing a complaint in the future seeking reparations because of AT & T's alleged discriminatory practices. *See In re Chesapeake & Potomac Telephone Co. of Maryland,* at ¶ 36 ("If Hecht can prove that others have not been paying the applicable charge *and that Hecht*

*has been damaged in some way because others paid too little,* it would presumably be entitled to recover reparations in a complaint proceeding.") (emphasis added). The Court simply finds that such alleged discrimination is not a defense in the instant action to AT & T's attempt to collect the LDMTS charges under the Tariff.

judgment on the following grounds: (A) the City may not recover the cost of the LDMTS in an action sounding in negligence or negligent performance of contract, (B) the City's remedy for any alleged breach of the contract by Northern Telecom is limited by the contract's repair remedy, and (C) the City is barred by the contract from recovering consequential damages. As discussed in detail below, the Court finds that summary judgment in Northern Telecom's favor is appropriate.

## A. NEGLIGENCE CLAIMS

The City has charged Northern Telecom with several forms of negligent conduct including negligent design of the PBX, negligent failure to warn its PBX customers of the possibility of unauthorized use of their PBX, and negligent installation of the PBX at HRA. However, as discussed below, the Court concludes that any negligence claims seeking recovery for economic loss resulting from the City's liability for the LDMTS calls must fail as a matter of law because (1) economic loss is not recoverable for a simple negligence claim, and (2) the City does not have a legally cognizable claim for negligent performance of contractual services under New York law.

### (1) *The Economic Loss Rule*

There is no contention by the City in the instant case that Northern Telecom's alleged negligence resulted in personal injury or property damage. Instead, the City is seeking recovery from Northern Telecom for a purely economic loss resulting from its liability to AT & T for the LDMTS calls.

▪ The general rule under New York law is that economic loss is not recoverable under a theory of negligence or strict products liability.[12] *See County of Suffolk v. Long Island Lighting Co.*, 728 F.2d 52, 62 (2d Cir.1984) ("New York law holds that a negligence action seeking recovery for economic loss will not lie."); *Price Bros. Co. v. Olin Constr. Co.*, 528 F.Supp. 716, 721 (W.D.N.Y.1981) (noting that plaintiff had correctly asserted that "New York does not recognize a cause of action in negligence (or strict products liability) when the recovery sought is economic loss"); *Mid–Hudson Mack, Inc. v. Dutchess Quarry & Supply Co.*, 99 A.D.2d 751, 753, 471 N.Y.S.2d 664, 666 (2d Dep't 1984) ("The law is clear in this state that economic loss (e.g., the cost of repair and consequential damages) may not be recoverable in an action predicated on negligence or strict products liability theory.") (citation omitted); *Hemming v. Certainteed Corp.*, 97 A.D.2d 976, 976, 468 N.Y.S.2d 789, 790 (4th Dep't 1983) ("the 'economic loss' rule applies equally to negligence and strict liability causes of action and includes the direct and consequential damages which may result from product nonperformance").

▪ The situation in the instant case is closely analogous to the facts presented to the Court in *Long Island Lighting Co. v. Transamerica Delaval, Inc.*, 646 F.Supp. 1442 (S.D.N.Y.1986). In that case, plaintiff *Long Island Lighting Co. ("LILCO")* asserted claims sounding, *inter alia*, in contract and tort against *Transamerica Delaval, Inc. ("Transamerica")* for supplying LILCO with defective diesel generators. LILCO alleged negligent failure to warn, negligent failure to perform services under a contract, and negligent design, manufacture, and testing of the

---

12. The New York Court of Appeals has articulated the underlying rationale for allowing the recovery of economic loss in contract actions but generally barring its recovery in actions sounding in negligence. A contractual remedy, such as breach of warranty, "seeks to provide the parties with the benefit of their bargain. It is, in essence, a remedy designed to enforce the agreement, express or implied, of the parties and to place them, should one of the parties fail to perform in accordance with the agreement, in the same position they would have been had the agreement been performed." *Martin v. Julius Dierck Equip. Co.*, 43 N.Y.2d 583, 589, 403 N.Y.S.2d 185, 188, 374 N.E.2d 97, 100 (1978). On the other hand, an action sounding in negligence or strict products liability "seeks to provide a remedy for an individual injured because of another's violation of an obligation imposed not by contract, but by law. It does not attempt to afford the injured party the benefit of any bargain, but rather endeavors to place him in a position he occupied prior to his injury. In other words, negligence and strict products liability causes of action seek to make the injured party 'whole.' " *Martin*, 43 N.Y.2d at 589, 403 N.Y.S.2d at 188, 374 N.E.2d at 100; *see also Price Bros. Co.*, 528 F.Supp. at 721.

generators. In that case, the Court dismissed the negligence claims, concluding that economic loss was not recoverable in a tort claim. The Court stated:

> An action in negligence or strict products liability seeks to redress injuries to persons or property. When compensation is sought for purely economic loss, the usual means of redress is an action for breach of contract, to give the parties the benefit of their bargain.

*Id.* at 1457; *see also Antel Oldsmobile–Cadillac, Inc. v. Sirus Leasing Co., Div. of Sirus Enterprises, Inc.,* 101 A.D.2d 688, 688–89, 475 N.Y.S.2d 944, 945 (4th Dep't 1984) (in suit for loss of stored data resulting from breakdown of defendants' computer system, negligence and strict products liability claims were precluded by economic loss rule).

Accordingly, in the instant case, the City's claims for negligence on the part of Northern Telecom, which seek recovery for the economic loss that resulted from its liability to AT & T for the LDMTS calls, must fail as a matter of law and summary judgment on those claims is appropriate.

### (2) *Negligent Performance of Contract*

■ The Court recognizes that an exception to the economic loss rule exists, under limited circumstances, for claims for negligent performance of contractual services. *See Consolidated Edison Co. of New York, Inc. v. Westinghouse Elec. Corp.,* 567 F.Supp. 358, 364 (S.D.N.Y.1983) (a cause of action is recognized under New York law for negligent performance of contractual services and "a suit for negligent performance of contractual duties is clearly available even where only economic injury is alleged"); *see also Ajax Hardware Mfg. Corp. v. Industrial Plants Corp.,* 569 F.2d 181, 185 (2d Cir.1977) ("[n]egligent performance of a contract may give rise to a claim sounding in tort as well as one for breach of contract."). However, in the instant case, the Court finds, as a matter of law, that the City cannot allege a tort claim for negligent performance of contract.

First, this limited exception to the economic loss rule applies only to contracts for services. Thus, in *Consolidated Edison,* while the Court noted that recovery for economic loss is available for negligent performance of

contractual *services,* the Court emphasized that, with respect to contracts for the provision of *goods,* "New York law does not permit recovery, in negligence, of economic loss." *Id.* at 365; *see also Niagara Mohawk Power Corp. v. Stone & Webster Eng'g Corp.,* 725 F.Supp. 656, 660 (N.D.N.Y.1989) ("*Ajax Hardware* can reasonably be construed as standing for the proposition that the negligent performance of a *contract for services* states a cause of action in tort under New York law") (emphasis added).

■ In the instant case, the contract between the City and Northern Telecom was for the sale of goods and not the provision of services. The installation services that Northern Telecom undertook as part of the contract were merely incidental to the sale of the PBX to the City. Therefore, despite the installation service, the contract between the City and Northern Telecom remains one for the sale of goods. Accordingly, New York law precludes recovery by the City for economic loss under a negligent performance of contract claim.

In *Word Management Corp. v. AT & T Info. Sys., Inc.,* 135 A.D.2d 317, 525 N.Y.S.2d 433 (3d Dep't 1988), the court was presented with negligence claims similar to those raised by the City in the instant case and reached the same conclusion. In that case, plaintiff Word Management Corp. ("Word Management") bought a communications system called "System 75" from AT & T Information Systems, Inc. ("AT & T") pursuant to a contract. AT & T installed System 75 and made it operational. Word Management subsequently charged AT & T with negligence in failing to make System 75 operational to the specifications that it required. The court reiterated the general rule that, in contracts for the sale of goods, economic loss is not recoverable under a theory of negligence. More specifically, the court held:

> [T]his action seeks to recover for economic loss, not for personal injury or property damage. That being the case, if the transaction is deemed to be a sale of goods, and thus falls within U.C.C. article 2, plaintiff [Word Management] is limited to its contractual remedies and may not maintain

the traditional tort causes of action of negligence or strict products liability. However, if the transaction is deemed to be predominantly service oriented, the case falls outside U.C.C. article 2 and plaintiff would have no cause of action for breach of implied or express warranties but would have a cause of action for negligence.

135 A.D.2d at 321, 525 N.Y.S.2d at 435–36 (citations omitted). The court then dismissed Word Management's negligence claim, concluding that, even though AT & T provided installation services, the contract between AT & T and Word Management was a contract for the sale of goods:

Here, it is clear that the contract was for a sale of goods, not services. The written contract and the other evidence in the record indicate that System 75 was a product which was sold to plaintiff to perform data transmitting functions. There is nothing to indicate that defendant was to perform any services other than installing System 75 and making it operational. While it is obvious that some service was involved, this was a sale of goods, not a service-oriented transaction. Thus, the negligence cause of action should have been dismissed.

135 A.D.2d at 321, 525 N.Y.S.2d at 436.

The contract between the City and Northern Telecom in the instant case, like the contract in *Word Management,* was for the sale of goods even though some service was involved. Thus, New York law precludes all of the claims by the City against Northern Telecom which seek to recover for purely economic losses (*i.e.* the cost of the LDMTS calls) under a theory of negligence or negligent performance of a contract.[13]

█ Moreover, assuming *arguendo* that the contract between the City and Northern Telecom is characterized as a contract for services, the City would still be unable to assert a tort claim for negligent performance of the contract because it has not demonstrated that Northern Telecom breached a

duty distinct from, or in addition to, the breach of contract. The New York Court of Appeals has explained the limited circumstances under which a breach of contract claim can constitute a tort:

It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated. This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract.

*Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.,* 70 N.Y.2d 382, 389, 521 N.Y.S.2d 653, 656–57, 516 N.E.2d 190, 193–94 (1987) (citations omitted); *see also Carco Inc. v. Beltrone Constr. Co.,* 183 A.D.2d 984, 985, 583 N.Y.S.2d 602, 603 (3d Dep't 1992) ("A mere breach of contract may not be the basis for a tort cause of action unless a legal duty independent of the contract itself has been violated.") (quotation and citation omitted); *Luxonomy Cars, Inc. v. Citibank, N.A.,* 65 A.D.2d 549, 550, 408 N.Y.S.2d 951, 954 (2d Dep't 1978) ("a tort may accompany a breach of contract, but only where the contract creates a relation out of which springs a duty, independent of the contract obligation, and that independent duty is also violated"); *Wegman v. Dairylea Coop., Inc.,* 50 A.D.2d 108, 112, 376 N.Y.S.2d 728, 734 (4th Dep't 1975) ("A breach of contract does not give rise to a tort action, in the absence of special additional allegations of wrongdoing.") (citations omitted), *appeal dismissed,* 38 N.Y.2d 918, 382 N.Y.S.2d 979, 346 N.E.2d 817 (1976).

█ For example, courts have found that professionals rendering services pursuant to a contract have a "duty of due care" independent of the contract when providing a professional service. Breaches of this "duty of due care" are actionable in tort. *See, e.g., William Wrigley Jr. Co. v. Waters,* 890 F.2d 594, 602–03 (2d Cir.1989) (trademark registration agents holding themselves out as experts

---

**13.** While the City cites *AT & T Info. Sys., Inc. v. McLean Business Servs., Inc.,* 175 A.D.2d 652, 652, 572 N.Y.S.2d 582, 582 (4th Dep't 1991), that case is clearly distinguishable from the instant case because it involved not only the installation of a telephone answering system, but also a service obligation to maintain the product. Thus, it clearly involved a contract for services, rather than the sale of goods.

pursuant to a contract were liable as a matter of law in tort for breaching their duty of due care); *Sears, Roebuck & Co. v. Enco Assocs., Inc.*, 43 N.Y.2d 389, 394–95, 401 N.Y.S.2d 767, 768–69, 372 N.E.2d 555, 556–57 (1977) (pursuant to a service contract, plaintiff could assert negligent design and engineering claims against architects); *Charles v. Onondaga Community College*, 69 A.D.2d 144, 146, 418 N.Y.S.2d 718, 720 (4th Dep't 1979) ("A duty extraneous to the contract often exists where the contract results in or accompanies some relation between the parties out of which arises a duty of affirmative care as in cases involving bailor and bailee, public carrier and passenger, innkeeper and guest, lawyer and client, or principal and agent."), *appeal dismissed*, 48 N.Y.2d 650, 421 N.Y.S.2d 200, 396 N.E.2d 482 (1979).[14]

In the instant action, the City has failed to demonstrate that Northern Telecom has a legal duty independent of, or in addition to, the contract. There is no evidence in the record to suggest that the circumstances of the instant action are analogous to those in the above cited cases in which a duty separate from the contract was found to exist. More specifically, the installation of the PBX does not amount to the provision of professional services such that a "duty of due care" was created independent of the contract. *See Niagara Mohawk Power Corp.*, 725 F.Supp. at 666 ("The mere fact that the alleged breach involved a contract that encompassed the performance of services does not suffice as special additional allegations of wrongdoing which amount to 'a breach of a duty distinct from, or in addition to, the breach of contract.'") (quoting *North Shore Bottling Co. v. C. Schmidt & Sons, Inc.*, 22

N.Y.2d 171, 179, 292 N.Y.S.2d 86, 92, 239 N.E.2d 189, 195 (1968)); *see also T.P.K. Constr. Corp. v. Southern Am. Ins. Co.*, 752 F.Supp. 105, 110 (S.D.N.Y.1990). In fact, the City concedes that the "Second, Third and Fourth causes of action [*i.e.* the negligence claims] against Northern Telecom all arise out of the parties' contractual relationship and seek to enforce rights provided for in that contract." *See* City's Memorandum of Law in Opposition to Motion of Northern Telecom Inc. for Summary Judgment, dated September 25, 1992 ("City's Opposition to Northern Telecom"), at 25–26. Thus, the City has failed to set forth any basis for a tort claim for negligent performance of contract under New York law.

■■■■ The Court emphasizes that the City's use of the language of tort, without demonstrating that there is a legal duty independent of the breach of contract, does not transform the City's breach of contract claim into a valid claim sounding in tort. *See Clark–Fitzpatrick, Inc.*, 70 N.Y.2d at 390, 521 N.Y.S.2d at 657, 516 N.E.2d at 194 ("Merely charging a breach of a 'duty of due care', employing language familiar to tort law, does not, without more, transform a simple breach of contract into a tort claim."); *Megaris Furs, Inc. v. Gimbel Bros., Inc.*, 172 A.D.2d 209, 211, 568 N.Y.S.2d 581, 583 (1st Dep't 1991) (rejecting negligence claims as merely "represent[ing] an attempt to recast the breach of contract allegations as tort claims"). Accordingly, the Court finds that, under New York law, the Court must grant summary judgment in Northern Telecom's favor on the City's claims for negligence or negligent performance of contract.[15]

---

14. The Court notes that there are other situations where valid tort causes of action exist independent of a contract. As one court noted, "[s]uch tort claims are cognizable against a party to a contract who intentionally engages in a scheme to destroy the value of the plaintiff's property, or makes knowingly false representations, or where the long-standing relationship between contractual parties amounted to a fiduciary relationship whose breach could be actionable in tort, or for tortious interference with the performance of another contract." *Niagara Mohawk Power Corp.*, 725 F.Supp. at 666 (citations omitted).

15. The City also argues that section 5.2B of the General Provisions of the Sales Agreement au-

thorizes the City to maintain negligence claims against Northern Telecom notwithstanding the economic loss rule. The Court notes that section 5.2B cannot be read in isolation, but rather must be interpreted in conjunction with section 5.2A. When reading these two provisions together, the meaning of section 5.2B is clear and unambiguous. Section 5.2A provides that Northern Telecom will indemnify the City for liability resulting from claims by third parties for damage to person or property on the account of the negligence or fault of Northern Telecom or its employees. Section 5.2B, in the context of 5.2A, provides an additional remedy to the City by allowing the City to withhold payments under the contract in the event a claim is brought against the City

## B. BREACH OF CONTRACT CLAIM

In addition to the negligence claims, the City also has brought a breach of contract claim alleging that Northern Telecom breached the contract by providing a defective system which allowed unauthorized individuals to create remote access. The City seeks to recover consequential damages from Northern Telecom that resulted from this alleged breach. Northern Telecom argues the City cannot recover consequential damages for any alleged breach of the contract's express warranties, since the contract expressly excludes liability for such damages.

### (1) *Limited Remedy Clause for Breach of Express Warranty*

■ The contract at issue in the instant case includes an express warranty provision limiting the City's remedy for a breach of the contract to the repair of the PBX. *See* Sales Contract between the City and Northern Telecom, at § 2.3.3 (Annexed as Exhibit A to Affidavit of John M. Landry, Esq., sworn to on July 28, 1992 ("Landry Affidavit")). Remedies for the breach of express warranties may be limited to the repair or replacement of the sold equipment.[16] *See* N.Y.UCC § 2–316(4). However, N.Y.UCC § 2–719(2) provides that:

> Where circumstances cause an exclusive or limited remedy to fail its essential purpose,

remedy may be had as provided in this Act.

This section of the UCC has been interpreted to stand for the proposition that "whenever an exclusive remedy, which may have appeared fair and reasonable at the inception of the contract, as a result of later circumstances operates to deprive a party of a substantial benefit of the bargain," such an exclusive remedy is stricken from the contract. *Cayuga Harvester, Inc. v. Allis–Chalmers Corp.*, 95 A.D.2d 5, 11, 465 N.Y.S.2d 606, 611 (4th Dep't 1983) (quotation omitted); *see also Computerized Radiological Servs., Inc. v. Syntex Corp.*, 595 F.Supp. 1495, 1510 (E.D.N.Y.1984) ("A limited remedy fails of its essential purpose when the circumstances existing at the time of the agreement have changed so that enforcement of the limited remedy would essentially leave plaintiff with no remedy at all.") (citing *Wilson Trading Corp. v. David Ferguson, Ltd.*, 23 N.Y.2d 398, 404–05, 297 N.Y.S.2d 108, 113, 244 N.E.2d 685, 690 (1968)), *aff'd in part, rev'd and remanded in part on other grounds*, 786 F.2d 72 (2d Cir.1986); N.Y.UCC § 2–719, Official Comment 1 ("it is of the very essence of a sales contract that at least minimum adequate remedies be available" that preserve for a party "at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract").

arising from the negligence of Northern Telecom's employees. Thus, section 5.2B allows the City to withhold payments, as a set-off, to cover the claims which Northern Telecom will have to indemnify under section 5.2A.

Section 5.2B, when read in conjunction with section 5.2A, clearly does not address Northern Telecom's negligence vis-a-vis the City, but rather focuses exclusively on Northern Telecom's indemnification of the City for claims arising from Northern Telecom's negligent acts *toward third parties*. The instant case involves Northern Telecom's alleged negligence towards the City, not a third party. In other words, AT & T's claim against the City is not based upon any allegations of negligence on the part of Northern Telecom, but rather is simply an attempt to collect charges under the Tariff. The only claims of negligence in the instant case are being asserted by the City directly against Northern Telecom. Thus, section 5.2B has no application to these direct claims of negligence against Northern Telecom and cannot be used as a basis to overcome the economic loss rule.

In any event, section 5.2 does not abrogate the economic loss rule, but rather explicitly limits indemnification to situations involving physical injury or property damage. *See* Section 5.2A. Therefore, the plain terms of the indemnification provision embodied in section 5.2A, and the corresponding set-off remedy contained in section 5.2B, are clearly inapplicable to claims of economic loss that exist in the instant case.

Having reviewed the clear and unambiguous language of section 5.2, the Court concludes that neither section 5.2A nor section 5.2B provides the City with a contractual basis upon which to abrogate the economic loss rule and assert claims of negligence, or even indemnification, against Northern Telecom based upon AT & T's claim for LDMTS charges.

16. N.Y.UCC § 2–316(4) provides:

> Remedies for breach of warranty can be limited in accordance with the provisions of this Article on liquidation or limitation of damages and on contractual modification of remedy (Sections 2–718 and 2–719).

The City characterizes the benefit of its bargain with Northern Telecom as the containment of telephone costs. *See* City's Opposition to Northern Telecom, at 22. Moreover, the contract provided that Northern Telecom would sell a PBX system to HRA that was free from defects. Thus, the City argues that the remote access fraud at HRA, which was allegedly made possible by a "defect" in the PBX, constituted a changed circumstance which caused the sale contract's exclusive repair remedy to fail its essential purpose.

In contrast, Northern Telecom contends that the City clearly received the benefit of the bargain and the undisputed facts demonstrate that the remedy has not failed its essential purpose:

> The City's own corrective actions after the abuse demonstrate that the City in fact received and has never lost the benefit of its bargain with [Northern Telecom]. After the episode of abuse, the City implemented CDR [Call Detail Recording], issued new SL–1 passwords, changed the locks to the PBX Room, and removed the criminals from their positions in charge of the system. The record does not indicate that any further corrective measures, such as system upgrade or replacement or modification of system software or hardware, were necessary for the proper operation of the system. The system the City used before the incident of abuse is the same system in operation today. The only defect was the defect in the moral character of City employees who abused the switch.

Reply Memorandum of Law of Third Party Defendant Northern Telecom, Inc. in Support of Its Motion for Summary Judgment, dated October 23, 1992, at 23 (citation omitted).

 Assuming *arguendo* that the City is correct in its contention that the limitation of remedy clause fails its essential purpose, the City still cannot recover the consequential damages resulting from the unauthorized LDMTS calls unless it can also defeat the separate limitation of consequential damages clause contained in the contract. As discussed below, the Court finds that the limitation of consequential damages clause requires dismissal of the City's breach of contract claim as a matter of law.[17]

### (2) *Limitation of Consequential Damages Clause*

 In addition to the limited repair remedy provision, the contract between Northern Telecom contains a limitation on consequential damages clause:[18]

> Notwithstanding anything in this Article or in this Contract to the contrary, Seller and City shall not be liable for incidental or consequential damages of any nature whatsoever for any default under or breach of this Contract.

Sale's Agreement, at 21, § 15.11 (Annexed as Exhibit A to Landry Affidavit). It is well settled that the fact that the limited repair remedy failed its essential purpose does not automatically invalidate a limitation of consequential damages provision. *See Computerized Radiological Servs., Inc.*, 595 F.Supp. at 1510 ("Even though an exclusive remedy is stricken because it fails of its essential purpose, that does not mean that all limitations must be stricken."); *American Elec. Power Co. v. Westinghouse Elec. Corp.*, 418 F.Supp. 435, 454–60 (S.D.N.Y.1976) (limitation of consequential damages provision stands independently of the contract's warranty clause); *County Asphalt, Inc. v. Lewis Welding & Eng'g Corp.*, 323 F.Supp. 1300, 1309 (S.D.N.Y.1970) (where an exclusive remedy fails its essential purpose it "should be ignored" but "other clauses limiting remedies in less drastic manners and on different theories would be left to stand or fall independently of the stricken clause"), *aff'd*, 444 F.2d 372 (2d Cir.), *cert. denied*, 404 U.S. 939, 92 S.Ct. 272, 30 L.Ed.2d 252 (1971); *Cayuga*

---

17. Given the Court's ruling below, the Court need not resolve whether the limited repair remedy fails its essential purpose.

18. Consequential damages are defined as including "(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and (b) injury to person or property proximately resulting from any breach of warranty." N.Y.UCC § 2–715(2).

*Harvester, Inc.,* 95 A.D.2d at 16, 465 N.Y.S.2d at 614 (" 'The limited remedy of repair and a consequential damages exclusion are two discrete ways of attempting to limit recovery for breach of warranty. (Citations omitted.) The Code, moreover, tests each by a different standard. The former survives unless it fails of its essential purpose, while the latter is valid unless it is unconscionable. We therefore see no reason to hold, as a general proposition, that the failure of the limited remedy provided in the . contract, without more, invalidates a wholly distinct term in the agreement excluding consequential damages.") (quoting *Chatlos Sys., Inc. v. National Cash Register Corp.,* 635 F.2d 1081, 1086 (3d Cir.1980)); *see also Long Island Lighting Co.,* 646 F.Supp. at 1458. Therefore, the Court must examine the validity of the clause disclaiming consequential damages *independent* of the repair remedy clause in the contract.

■ Under N.Y.UCC § 2–719 the "parties are left free to shape their remedies to their particular requirements and reasonable agreements limiting or modifying remedies are to be given effect." N.Y.UCC § 2–719, Official Comment 1. Therefore, unless the provision is unconscionable, a limitation or exclusion of consequential damages must be upheld by the Court. *See* N.Y.UCC § 2–719(3) ("Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable.").

■ The City asserts that the disclaimer of consequential damages in the contract is unconscionable and must, therefore, be stricken from the contract. The question of unconscionability is for the Court to resolve as a matter of law. *See American Dredging Co. v. Plaza Petroleum Inc.,* 799 F.Supp. 1335, 1339 (E.D.N.Y.1992) ("The issue of unconscionability is a matter of law for the court to decide and it does not automatically defeat a motion for summary judgment."); *Wilson Trading Corp. v. David Ferguson, Ltd.,* 23 N.Y.2d 398, 403–04, 297 N.Y.S.2d 108, 112, 244 N.E.2d 685, 689 (1968) ("Whether a contract or any clause of the contract is unconscionable is a matter of law for the court to decide against the background of the contract's commercial setting, purpose, and

effect, and the existence of this issue would not therefore bar summary judgment."); *Estate of Arena v. Abbott & Cobb, Inc.,* 158 A.D.2d 926, 926, 551 N.Y.S.2d 715, 716 (4th Dep't 1990) ("unconscionability is a question of law to be decided by the court"), *appeal denied,* 75 N.Y.2d 710, 557 N.Y.S.2d 309, 556 N.E.2d 1116 (1990); *see also* N.Y.UCC § 2–302(1) ("If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract. . . .").

The New York Court of Appeals has noted that "[t]he doctrine [of unconscionability], which is rooted in equitable principles, is a flexible one and the concept of unconscionability is 'intended to be sensitive to the realities and nuances of the bargaining process.' " *Gillman v. Chase Manhattan Bank, N.A.,* 73 N.Y.2d 1, 10, 537 N.Y.S.2d 787, 791, 534 N.E.2d 824, 828 (1988) (quoting *Matter of State of New York v. Avco Fin. Serv. of N.Y., Inc.,* 50 N.Y.2d 383, 389–90, 429 N.Y.S.2d 181, 185, 406 N.E.2d 1075 (1980)). More specifically, "[a] determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made—i.e., some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Gillman,* 73 N.Y.2d at 10, 537 N.Y.S.2d at 791, 534 N.E.2d at 828 (quotation and citations omitted).

With respect to the procedural element of unconscionability, the Court must engage in "an examination of the contract formation process and the alleged lack of meaningful choice." *Gillman,* 73 N.Y.2d at 10–11, 537 N.Y.S.2d at 791, 534 N.E.2d at 828. Thus, "[t]he focus is on such matters as the size and commercial setting of the transaction, whether deceptive or high-pressured tactics were employed, the use of fine print in the contract, the experience and education of the party claiming unconscionability, and whether there was disparity in bargaining power." *Gillman,* 73 N.Y.2d at 11, 537 N.Y.S.2d at 791, 534 N.E.2d at 828 (citations omitted). With respect to substantive unconscionabili-

ty, "[t]his question entails an analysis of the substance of the bargain to determine whether the terms were unreasonably favorable to the party against whom unconscionability is urged." *Gillman*, 73 N.Y.2d at 12, 537 N.Y.S.2d at 792, 534 N.E.2d at 829. In *Cayuga Harvester, Inc.*, the court noted:

> In cases involving transactions of a commercial nature, courts have rarely found unconscionability, and it has been held that when businessmen contract in a commercial setting, a presumption of conscionability arises.

95 A.D.2d at 20, 465 N.Y.S.2d at 606 (quotation and citations omitted); *see also American Dredging Co.*, 799 F.Supp. at 1339 ("When the contract is between two commercial entities, unconscionability must be viewed in light of the general commercial background and the commercial needs of the particular trade or case, and there is a presumption of conscionability when the contract is between businessmen in a commercial setting. Courts have rarely found a clause to be unconscionable in a commercial contract.") (quotation omitted).[19]

■ The Court finds that the City's assertion that the consequential damages clause is unconscionable to be completely without merit. With respect to procedural unconscionability, the Court notes that the contract at issue in the instant action is not the type of contract entered into by an unwary consumer, but rather was a complex and painstakingly negotiated commercial agreement between two highly competent parties resulting from a competitive bidding process. In this commercial setting, the City cannot claim that it was placed in a bargaining position where it lacked meaningful choice. The Court finds that there is absolutely no basis for a procedural unconscionability argument.

■ Similarly, with respect to substantive unconscionability, the Court finds that the terms contained in the contract are not unreasonably favorable to Northern Telecom.[20] The City, as a governmental entity, is not entitled to special treatment with respect to the unconscionability doctrine. *See Lister Elec., Inc. v. Incorporated Village of Cedarhurst*, 108 A.D.2d 731, 484 N.Y.S.2d 897 (2d Dep't 1985) ("the elements of the doctrine of unconscionability may not be disregarded simply because the party claiming to be victim of an unconscionable contract is a governmental entity").

■ While the City seeks a hearing on the issue of unconscionability, the Court finds that a hearing is unwarranted. As discussed above, there is no evidence which suggests that any of the indicia of unconscionability are present under the circumstances of this case. Thus, the City has failed to raise any doubt on the issue of unconscionability which would require an evidentiary hearing by this Court. *See Advance Burglar Alarm Sys., Inc. v. D'Auria*, 110 A.D.2d 860, 862, 488 N.Y.S.2d 416, 418 (2d Dep't 1985) ("Where there is no doubt that a contract or clause thereof is free from unconscionability, there is no requirement for a hearing on this issue."); *see also Carvel Corp. v. Rait*, 117 A.D.2d 485, 491, 503 N.Y.S.2d 406, 411 (2d Dep't 1986) (allegations of unconscionability insufficient to warrant evidentiary hearing). Accordingly, the Court, as a matter of law, rejects the City's unconscionability argument and finds that a hearing on this issue is unnecessary.

■ The Court recognizes that, even in the absence of unconscionability *per se*, "[a] defendant may be estopped from asserting a contractual limitation of consequential damages if the defendant has acted in bad

---

**19.** In *AT & T Information Systems, Inc. v. McLean Business Servs., Inc., supra*, while the court apparently rejected plaintiff's argument, on a partial summary judgment motion, that defendant's counterclaim for breach of contract was precluded by a provision in the contract that barred recovery of consequential damages, the opinion contains no discussion of that issue. Therefore, the opinion provides no guidance to this Court on the issue of unconscionability, in the context of a limitation of consequential damages clause, under New York law.

**20.** Moreover, the Court notes that the contract terms in the instant case do not fall into the exceptional category of cases where a provision of a contract is so outrageous that it is unenforceable on the ground of substantive unconscionability alone. *See Gillman*, 73 N.Y.2d at 12, 537 N.Y.S.2d at 792, 534 N.E.2d at 829.

faith." *Long Island Lighting Co.*, 646 F.Supp. at 1458; *see also County Asphalt, Inc.*, 323 F.Supp. at 1308; *Cayuga Harvester, Inc.*, 95 A.D.2d at 13, 465 N.Y.S.2d at 613. However, the Court finds that the City clearly has not raised a genuine material issue of fact as to bad faith or a willfully dilatory motive on the part of Northern Telecom. The Court notes that the complaint is utterly devoid of any allegations of fraud, willful misconduct, or bad faith by Northern Telecom with respect to the remote access fraud at HRA. Instead, the complaint refers exclusively to allegedly negligent acts by Northern Telecom—*i.e.* negligent design, negligent installation, and negligent failure to warn.

 The City's argument in opposition to the motion for summary judgment follows this same negligence theory. For example, the City concedes that "[i]n November 1986 ... Northern Telecom prepared a letter which was supposed to alert its customers to many abuses, including DISA [*i.e.* remote access] simulation, which could occur on the SL–1 PBX." *See* City's Memorandum of Law in Opposition, at 10. The City also acknowledges that "[i]n February 1987 Northern Telecom prepared a 'Product Bulletin' regarding 'excessive fraudulent toll calling' which could occur on PBX's, including the SL–1." *Id.* The City's contention is merely that they never received these letters.[21] *Id.* Thus, the City's argument is

based upon a theory that Northern Telecom *negligently* failed to warn HRA of the problem of remote access fraud, and not that Northern Telecom, acting fraudulently or with bad faith, actively concealed such problems from the City.

Even if the City had attempted to allege bad faith or willfully dilatory motive, the Court finds that there is absolutely no evidence in the record to support such a contention. Assuming *arguendo* that HRA did not receive the warnings issued by Northern Telecom regarding the remote access fraud and other forms of toll abuse as the City contends, the City has set forth no evidence from which a rational factfinder could conclude that the alleged failure to warn was motivated by willfulness or bad faith. Drawing all reasonable inferences in the City's favor, the record, at best, suggests that Northern Telecom negligently failed to warn the City of the remote access fraud problem and negligently failed to correct that problem. Thus, the Court concludes that the City has failed to raise a material issue of fact on the issue of bad faith which would preclude summary judgment in Northern Telecom's favor.

 In sum, the limitation of consequential damages clause precludes the City from asserting a claim for breach of contract seeking recovery for the LDMTS charges resulting from Northern Telecom's alleged breach.[22] Accordingly, summary judgment

---

21. Northern Telecom argues that it "successfully informed the City of the potential for certain abuses through its other SL–1 sites more than 7 months before the episode of fraud at HRA." Northern Telecom's Reply Memorandum, at 24; *see also* Reply Affidavit of John M. Landry, Esq., sworn to on October 23, 1992, at Exhibit F.

22. While it has been recognized that "[i]n general, the precise demarcation between direct and consequential damages is a question of fact," *American Elec. Power Co. v. Westinghouse Elec. Corp.*, 418 F.Supp. 435, 459 (S.D.N.Y.1976), the undisputed facts in the instant case require the Court to find, as a matter of law, that the damages sought by the City (*i.e.* the cost of the LDMTS calls) constitute consequential damages, rather than direct damages. It is well-accepted that "any items of increased costs incurred as a consequence of the breach will be considered as consequential damages." *American Elec. Power Co.*, 418 F.Supp. at 460 n. 44. On the other

hand, "expenditures which are not incurred as a consequence of the breach, but were instead incurred before the breach occurred and in reliance on the contractual warranties, are recoverable as direct damages." *Id.*

In the instant case, the cost of the LDMTS calls resulting from the remote access fraud at HRA, which the City claims was made possible by a defect in the equipment, must constitute consequential damages. While parties are free to provide the definition of consequential damages in the contract, there is no language in the contract which alters the standard categories of consequential and direct damages. To the extent that the City argues that section 5.2B serves this function, the Court, as noted earlier, finds that the unambiguous language of section 5.2 indicates that it only applies to personal injury and property damage, and not economic loss. Thus, under the circumstances of this case, the Court finds that there are no material issues of fact, or contract interpretation, as to whether the dam-

in Northern Telecom's favor on the breach of contract claim is appropriate.[23]

## CONCLUSION

For the foregoing reasons, AT & T's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure hereby is granted. The City's cross-motion for summary judgment against AT & T is denied. In addition, Northern Telecom's motion for summary judgment hereby is granted.

Further, on the current record the Court finds no justification supporting the filing under seal of this Opinion and Order. However, the Court is mindful of the parties' interests in confidentiality and therefore will file under seal this Opinion and Order. The parties hereby are directed to file within ten days specific written objections, if any, to the unsealing of this Opinion and Order. After receiving any objections, the Court will determine whether this Opinion and Order properly should be filed under seal.

SO ORDERED.

ages sought constitute direct or consequential damages.

**23.** To the extent that the Court treats the three negligence claims as breach of contract claims, those claims also are precluded by the limitation of consequential damages clause.