COLUMBUS McKINNON
CORPORATION,
Plaintiff,

v.

CHINA SEMICONDUCTOR
CO., LTD., Defendant.

CHINA SEMICONDUCTOR CO.,
LTD., Third–Party Plaintiff,

v.

Raymond NEWMAN d/b/a Micro Designs,
Third–Party Defendant.

No. 88–CV–0211E (F).

United States District Court,
W.D. New York.

Nov. 22, 1994.

William Reith, Buffalo, NY, Mark Ladner, New York City, for plaintiff.

Michael A. Brady, Buffalo, NY, for defendant.

Erie W. Lawson, Jr., East Aurora, NY, for third-party defendant.

## MEMORANDUM AND ORDER

ELFVIN, District Judge.

Presently before this Court is a motion by third-party defendant Newman to dismiss the Third–Party Complaint of China Semiconductor Co, Ltd. ("CSC") and, in the alternative, to request a more definite statement. For the reasons stated herein, Newman's motion to dismiss will be granted.[1]

Plaintiff Columbus McKinnon Corporation ("CM") brought this diversity action against CSC in connection with CM's efforts to develop the first computer-assisted hoist. CM is a New York corporation with its principal place of business in the Town of Amherst, N.Y. CSC is a foreign corporation headquartered in Taiwan. Plaintiff's First Amended Complaint ("Complaint") ¶¶ 1–2. See 28 U.S.C. §§ 1332, 1391(a).

By way of background, this case mainly and primarily focuses on an allegedly defective computer microprocessor ("chip") utilized in the control board of the hoist. CM asserts that in 1983 it entered into a written agreement with CSC for the purchase of computer boards manufactured by CSC for the hoists. The agreement provided that CSC would utilize "an Intel 8049 micropro-

cessor" in such boards or, at CM's option, an equivalent chip. Complaint, ¶ 8. The control board was designed by Newman, who had been contractually retained by CM for that purpose. The Intel 8049 chip allegedly was an integral part of the control board design. Id. ¶ 7. At CSC's suggestion, CM and CSC agreed that CSC should purchase the chips from United Microelectronics Corp. ("UMC"), which CSC represented to be an Intel licensee. The manufactured control boards incorporating the UMC chip, were delivered to CM in New York. Id. ¶¶ 10–12. The control boards are alleged to have been defective, with CM later determining that the "faulty" chip (faulty because it was not an Intel 8049 equivalent) was the cause of many of the problems with the hoists. Id. ¶¶ 13–15.

CM proceeds against CSC under the theories of breach of contract, breaches of implied and express warranties, as a third-party beneficiary of the contract between UMC and CSC for the purchase of the chips, and under a theory of fraudulent misrepresentation. Id. ¶¶ 16–48. Among the responses of CSC in its Answer to the First Amended Complaint ("Answer") are the assertions that CM, "its agents or other parties over which CSC had no control" caused the alleged defects in the computer boards. Answer ¶ 49. CSC further asserts that CM was responsible for the computer board design and "the software components of the computer chip" and that CSC cannot be held liable for damages resultant therefrom. Id. ¶ 51.

The original complaint in this action was filed February 19, 1988, served on the defendants months thereafter and answered by CSC December 14, 1988. The First Amended Complaint was filed August 17, 1989 and answered by CSC September 15, 1989. Over three years later, CSC moved before United States Magistrate Judge Leslie G. Foschio of this Court for leave to file a third-party

---

1. Because both parties to the instant motion have taken a minimalist approach to arguing and substantiating their respective positions, much of the legal analysis contained herein did not find its source in either CSC's Memorandum of Law in Opposition to Motion of Third–Party Defendant to Dismiss or in the Alternative for a More Definite Statement or through any assistance from Newman. For whatever reason, Newman failed to submit a Memorandum of Law in support of his position, even to point out CSC's failure to cite pertinent authority to this Court.

complaint against Newman.[2] Leave having been granted, CSC served and filed its Third–Party Complaint, reiterating its denial of any liability to CM, while alleging in the alternative that, if it is found liable to CM, "Newman is responsible in whole or in part for the damages suffered by [CM] based on his negligence, malfeasance, professional malpractice, and culpable acts and omissions." Third–Party Complaint ¶ 15. CSC, in essence, does not seek to hold Newman liable to itself directly, but seeks instead "contribution and/or indemnification" from Newman for any damages for which CSC is found liable to CM. Newman's Third–Party Answer denies any responsibility for such damages. He now seeks dismissal of the third-party action "pursuant with Rule 56(b) because the complaint fails to state a claim against [him] upon which relief can be granted, or, alternatively, * * * [p]ursuant with Rule 10–B, * * * for a more definite statement * * *." Notice of Motion to Dismiss for Failure to State a Claim and, in the alternative, Motion for a More Definite Statement, at 1–2.

A district court in ruling upon a FRCvP 12(b) motion to dismiss a complaint for failure to state a claim upon which relief can be granted has two options when, as in this case, matter outside the pleading has been presented in support thereof. The court may exclude the additional material and decide the motion on the complaint alone or it may convert the motion to one for summary judgment under FRCvP 56 and afford the parties an opportunity to present pertinent supporting material. FRCvP 12(b); *Kopec v. Coughlin,* 922 F.2d 152, 153 (2d Cir.1991); *Fonte v. Bd. of Mgers. of Continental Towers Condo.,* 848 F.2d 24, 25 (2d Cir.1988). Because this motion was originally noticed by Newman as one under FRCvP 56(b) and both parties have submitted affidavits in support of their respective positions and have participated in oral argu-

ments on the motion, this Court will proceed as if it were one for summary judgment under FRCvP 56. *Grand Union Co. v. Cord Meyer Development Corp.,* 735 F.2d 714, 716–717 (2d Cir.1984). Such motion may be granted if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FRCvP 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Only disputes over facts that might affect the outcome of the suit under the governing substantive law will properly preclude the granting of such a motion. In other words, only *genuine* issues that relate to *material* facts will defeat a motion for summary judgment. Facts that do not relate to the legal elements of a claim are not material. *Anderson,* 477 U.S. at 247–248, 106 S.Ct. at 2509–10. Further, the party opposing the motion may not rest solely on mere allegations, but must present competent evidence showing that there is a genuine and material factual issue for trial; a "mere existence of a scintilla of evidence" supporting the non-movant's case is insufficient to defeat a motion for summary judgment. *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512.

Newman has submitted an affidavit and several exhibits in support of his motion. To the extent that his averments are uncontested, they may be summarized as follows: As a consultant he entered into a "non-specific 'Consultant's Agreement' with [CM] on September 14, 1982 to perform research, development and design work." Third Party Defendant's Affidavit in Support of His Motion to Dismiss, or Alternatively, to be supplied with a more definite statement (sworn to July 29, 1993) ("Newman Affidavit"), at ¶¶ 1, 2. He relates therein that, on September 30, 1982, he and CM entered into an "agreement" for the development of hardware and software for control boards using a microprocessor chip, that a prototype was built using

2. By a previous Order of this Court, all nondispositive motions had been referred to Judge Foschio. Rule 14(a) of the Federal Rules of Civil Procedure requires that a defendant obtain leave of the Court to file a third-party complaint if such filing is to occur more than ten days after the serving of its "original answer." CSC's an-

swer to the amended complaint and was filed September 15, 1989 and must, in all rationality, be considered to have been its original answer. Leave to file the Third–Party Complaint was requested December 28, 1992 and was granted by Judge Foschio January 22, 1993.

Newman's design and "an Intel chip," that this prototype worked properly and that, after he had learned that CM could not secure an adequate supply of the specified chips from Intel, he had cautioned CM against purchasing chips that were made neither in the United States nor by a "US licensee." Newman continuingly states that he had not been involved in the agreement between CM and CSC to buy UM8049 chips manufactured by UMC and that he had not been involved in arranging for the purchase of those chips. After the chips had been installed in the hoists and the hoists placed in operation, malfunctioning occurred. Newman thereafter cooperated with CM in an attempt to repair and redesign the hoists so that they would operate properly, traveling to Taiwan in February 1985 at the request of CM. He then diagnosed the source of the trouble as the intolerance of the UM8049 chips to "random 'electrical noise.'" It evolved that these chips had been manufactured by an offshore producer who was not a US licensee. After Newman had redesigned the hoists, employing a chip meeting his original specifications, they operated properly. Newman then notes that the agreement to purchase the UM8049 chips had been entered into between CM and CSC, that he was never a party to such contract and that he never contracted to supply such chips. He also states that he had never been in privity with CSC and never had had any "mutuality of interest" with CSC. Exhibit B to the Newman Affidavit is said to be the above-mentioned written agreement between CM and Newman and appears to cover the design of hardware and software and the delivery of a working prototype in six weeks including "production field test unit debugging." Newman Affidavit, Exhibit B. Exhibits C and D thereto appear to be after-the-fact letters by Newman, recounting the problems with the hoists and his involvement in resolving the problems that arose post-production. The affidavit and exhibits make clear that his relationship with CM had been contractual and that he had

had no contractual relationship with CSC. In opposition to Newman's motion, CSC submitted an affidavit of its attorney with, as Exhibits A, B and C, excerpts from transcripts of the deposition testimony given by CM's employee Robert H. Broyden and Broyden's December 8, 1981 interoffice memorandum and other CM documents as Exhibit D. Affidavit of Michael A. Brady, Esq. (sworn to August 6, 1993); Defendant and Third–Party Plaintiff, China Semiconductor Co. Ltd.'s Memorandum of Law in Opposition to Motion of Third–Party Defendant to Dismiss or in the Alternative for a More Definite Statement ("CSC's Memorandum of Law").

For the purposes of background, additional facts that appear at least arguably pertinent are referenced under two subheadings under the heading "Statement of Facts" within CSC's Memorandum of Law, the first being "The Selection of the 8049 Microprocessor," which may be summarized as follows: CM relied on Newman for the selection of the original and soon-to-be-unavailable microprocessor, and later for recommendations as to other manufacturers of a compatible chip after it had been learned that the original could not be obtained. Brady Affidavit at Exhibit A, pp. 39, 42–46. Broyden eventually had found what he either believed or was led to believe by CSC to be an Intel licensee in defendant UMC and another entity, Electronics Research & Service Organization. Newman's input had been neither requested nor offered relative to the selection of any of the defendant suppliers up to this point. Newman did, however, travel to Taiwan in June 1984 at the request of CM. According to the excerpts from the transcript of Broyden's testimony, Newman, at least to some extent, inspected the specifications for UMC's chip and reported back to Broyden that he was satisfied that the UMC chip was the equivalent of the Intel chip, confirming what Broyden already believed. Brady Affidavit, Exhibit A at 101, 114–115, 118–122.[3]

**3.** CSC characterizes Newman's role as central to CM's approval of CSC's supplying UMC's chips. The transcript excerpts submitted do not support this contention. It should also be noted that the testimony therein relates to documents that have not been submitted for the purposes of this motion. Portions of this testimony are therefore discounted. The fact that Newman was merely reaffirming Broyden's beliefs also undermines the assertion that Newman's role was central to the process of approving the UMC chip. CM's Complaint, however, does mention Newman's

CSC specifically points out that Newman's Affidavit makes no mention of the June 1984 trip to Taiwan.

The second subheading of factual references in CSC's Memorandum of Law is entitled "The Involvement of and Wrong–Doing By Newman and Micro Designs." *Id.* at 4. This section of the Statement of Facts deals with the design and pre-production testing of the control board and hoist as described in the CM–Newman agreement mentioned *supra.* It should be noted that these allegations also appear to reiterate the affirmative defenses that CSC has posed against CM— *viz.,* that any defect in the computer boards was caused by CM or its agents, CM's failure to mitigate and CSC's lack of control over the computer board design or the software components—which either reduce or obviate CSC's liability. *See* Answer ¶¶ 49–51.

■ FRCvP 14(a) provides in part: "[A] defending party, as a third-party plaintiff, may cause a summons and complaint to be served upon a person not a party to the action *who is or may be liable* to the third-party plaintiff for all or part of the plaintiff's claim against the third party plaintiff." (Emphasis added.)

As the above-emphasized language makes clear, a third-party claim is proper only if a non-party might be found liable to the defendant for all or a part of a plaintiff's successfully-asserted claim against a defendant. In a diversity action, a federal court must look to the applicable state substantive law in order to determine if such contingent liability exists. *Widett v. U.S. Fidelity and Guar. Co.,* 815 F.2d 885, 886 (2d Cir.1987). In the present case, there is no contention that New

York law is not controlling as between these parties. *See Brown v. Cranston,* 132 F.2d 631, 633 (2d Cir.1942) (state law of contribution controls whether third-party plaintiff may sustain a claim under such a theory), *cert. denied sub nom. Cranston v. Thompson,* 319 U.S. 741, 63 S.Ct. 1028, 87 L.Ed. 1698 (1943). Thus, irrespective of the lenient notice-pleading requirements of the federal rules and the broad discretion courts have in allowing the impleading of third parties—*see Old Republic Ins. Co. v. Concast, Inc.,* 99 F.R.D. 566, 568 (S.D.N.Y.1983)—, there still must be a basis for the third-party's liability to the defendant under state law. Under New York law, CSC claims that Newman is liable to it under the theories of indemnification and/or contribution for any damages for which it might be found liable.

CSC does not seek to hold Newman directly liable to it for any direct damages. Whether such a claim were grounded in contract or in tort, Newman owed no duty to CSC. Because he contracted solely with CM, there was no privity of contract by him with CSC and thus no contractual duty owed by him to CSC. It is also doubtful that CSC could assert that it was a third-party beneficiary of Newman's contract with CM. *See Morse/Diesel, Inc. v. Trinity Industries, Inc. ("Morse/Diesel III"),* 859 F.2d 242, 247–248 (2d Cir.1988) (under New York law there can be direct liability between or among subcontractors absent privity only when their respective contractual duties inure to the benefit of a third party asserting liability). Finally, because of this lack of any duty to CSC and because CSC has not suffered any injury to its person or property due to a dangerously defective product, Newman may not be

June 1984 visit to UMC in Taiwan in the company of representatives of CSC and of another defendant. Newman is referred to as "CM's announced agent and representative." Complaint ¶ 40 (attached to Third–Party Complaint as Exhibit C). It should also be noted that CSC states that, at the time of Newman's visit to Taiwan, *"no* 8049s had yet been manufactured by UMC." CSC's Memorandum of Law at 3. This assertion may be neither accurate nor relevant considering that purchase agreements had already been entered into between the parties. Furthermore, why would Newman go to inspect the UMC plant and its chips if none had yet been manufactured? Finally, Broyden stated that CM

already had "the initial run of chips", "had run what we called the 'full-function' tests and were satisfied with the results [and] were not expecting anything else." Brady Affidavit, Exhibit A at 122. Therefore, inasmuch as UMC and CSC would presumably supply the same product in the initial run, at least a modicum of chips was manufactured by UMC and supplied to CM and tested by CM, precipitating Newman's trip to Taiwan in June 1984. Another seemingly relevant fact is stated in CSC's Answer: "the published specifications for UMC microprocessor 8049 were equivalent to the published specifications for the Intel 8049 microprocessor * * *." Answer ¶ 38.

found directly liable to CSC under a theory of negligence or strict products liability. *See, e.g., Schiavone Const. Co. v. Elgood Mayo Corp.,* 81 A.D.2d 221, 439 N.Y.S.2d 933, 937–940 (1st Dept.1981) (Silverman, J., dissenting) (in commercial setting, loss of value, cost of repair, other economic losses should be recoverable under contract and warranty theories, not tort theories), *rev'd,* 56 N.Y.2d 667, 451 N.Y.S.2d 720, 436 N.E.2d 1322 (1982) (adopting Judge Silverman's dissenting opinion); *Bocre Leasing Corp. v. GMC,* 840 F.Supp. 231, 232–234 (E.D.N.Y. 1994) (discussing New York case law as consistently holding that there is no basis for a tort claim when the only injury is economic loss or damage to the product itself). Thus, there rightly can be no claim by CSC that Newman would be directly liable to it.

■ Whether Newman could be responsible, in whole or in part, for the damages suffered by CM but sought by the latter solely from CSC is a closer question. While it is generally true, as CSC asserts, that a third-party action is a proper vehicle for asserting a claim for indemnity or contribution, the authorities it cites in support of this proposition are inapposite to the present case, or have been abrogated by later decisional law. As previously stated, New York law is controlling on this issue.

■ Pursuant to such law, indemnity "usually arises from an express agreement by which one party [to a contract] agrees to hold the other harmless from claims brought against it by a third party." *Knight v. H.E. Yerkes and Associates, Inc.,* 675 F.Supp. 139, 143 (S.D.N.Y.1987). CSC does not allege any such agreement between it and Newman. In *Hanley v. Fox,* 97 A.D.2d 606, 468 N.Y.S.2d 193 (3d Dep't 1983), however, it was stated that under certain circumstances indemnity may be implied. "Indemnity * * * will be implied to allow one who was compelled to pay for the wrong of another to recover from the wrongdoer the damages paid to the injured party. But where the party seeking indemnification is himself at 'east partially at fault, indemnity will not be implied." *Id.,* 97 A.D.2d 606, 468 N.Y.S.2d at 194. *See also Knight, supra; Rock v. Reed–Prentice Div. of Packaging Machinery,* 39

N.Y.2d 34, 39, 382 N.Y.S.2d 720, 346 N.E.2d 520 (1976). CM's claim against CSC, for which CSC seeks indemnity from Newman, sounds primarily in contract and any recovery had by CM against CSC on its claims is necessarily predicated on establishing CSC's breach thereof. Under such circumstances, indemnity cannot be implied under New York law. Thus, as a matter of law, CSC has not stated a claim for indemnification. *See Knight, supra* at 143.

■ CSC also seeks from Newman contribution which is, in effect, partial indemnity. Section 1401 of New York's Civil Practice Laws and Rules ("CPLR"), New York's contribution statute, states:

> "Except as provided in section 15–108 of the general obligations law, two or more persons who are subject to liability for damages for the same personal injury, injury to property or wrongful death, may claim contribution among them whether or not an action has been brought or a judgment has been rendered against the person from whom contribution is sought."

At first glance, a basis for CSC's third-party claim under this theory appears tenable. As CSC quotes:

> " 'Article 1401 of the CPLR, as enacted in 1974, creates a right of contribution for a tort feasor [sic] regardless of whether or not the other tort feasors have been sued by P, the injured person. David D. Siegel, New York Practice, Section 172 (1978). CPLR 1401 ... applies not only to joint tort feasors, but also to concurrent, successive, independent, alternative, and even intentional tort feasors.' *Id.* Thus, under settled precedent, CSC is entitled to contribution and/or indemnification from Newman." CSC's Memorandum of Law at 7–8.

In this regard, CSC has attempted to frame CM's Complaint as one grounded in both contract and tort, and its own Third–Party Complaint as one grounded in tort. *Id.* at 2 (Newman's "actions and omissions show professional malpractice, negligence, malfeasance and breach of duty" entitling CSC to contribution if it is found liable for CM's injuries). Most likely, this is because New York's Court of Appeals has definitively stat-

ed that the above contribution statute has no application to claims that essentially sound in contract. *Bd. of Educ. v. Sargent, Webster, Et Al. ("Sargent")*, 71 N.Y.2d 21, 523 N.Y.S.2d 475, 517 N.E.2d 1360 (1987).[4] *See also Morse/Diesel III, supra*, 859 F.2d at 249–250; *Knight*, 675 F.Supp. at 144–146.

It is far from clear, however, that "settled precedent" affords CSC indemnification or contribution from Newman, as CSC claims. To so hold, this Court would have to conclude that (1) CM's complaint sounded in tort rather than in contract and (2) both (a) that Newman's alleged breach of his duty to CM was tortious and (b) that CSC sufficiently alleged a third-party claim for contribution based on such tortious behavior. Otherwise, such contribution would not be between two tortfeasors. Because whatever liability Newman would have had to CM would be contractual in nature, the above contribution statute has no application to the present case.[5] Thus, as a matter of law, CSC has not stated a claim for contribution against Newman. While CSC has raised disputed facts as to Newman's possible breach of duty to CM and as to any injuries caused by such breach, these facts are not material to the viability *vel non* of the claims against Newman. CSC has failed to present any facts showing that Newman breached a legal duty independent of his contractual relationship with CM. CSC has also failed to present any facts showing that the injuries suffered by Newman's breach were anything more than economic losses.

A discussion of pertinent New York case law illustrates the propriety of this conclusion. Such evidences a trend toward a stricter delineation between contract and tort by New York's courts in recent years, which delineation is ignored by CSC. For instance, in *Sargent, supra*, a school district sought damages for a faulty roof against an architectural firm and a general contractor involved in a high school construction project. Both had been hired by the school, but under separate contracts. Not unlike the present case, the complaint therein alleged various contractual claims, as well as a claim of fraudulent concealment. *Id.*, 71 N.Y.2d at 24, 523 N.Y.S.2d 475, 517 N.E.2d 1360. The trial court had granted the defendants' motions and dismissed the complaint as against the general contractor, finding that it sounded primarily in contract and was thus barred by the six-year statute of limitations applicable to contract actions under CPLR § 213(2). The Appellate Division had affirmed, specifically concluding that the school's claims against both parties sounded in contract. Thereafter, the architectural firm sought contribution and indemnification from the general contractor. Under a set of facts similar to those herein,[6] New York's Court of Appeals rejected the architectural firm's attempt to bring the general contractor into the case for the purposes of contribution. *Sargent* at 25–26, 523 N.Y.S.2d 475, 517 N.E.2d 1360. By looking at the legislative history of CPLR § 1401, as well as *Dole v. Dow Chemical Company*, 30 N.Y.2d 143, 331

**4.** CSC cites *Tower Mtg. Corp. v. Reynolds*, 81 F.R.D. 560 (W.D.Okla.1978), as support for its contention that the Third–Party Complaint should not be dismissed. While that Court found that a contracting third party could be found liable for contribution, that case dealt wholly with Oklahoma's substantive law. Assuming there are not any bizarre choice-of-law issues unresolved between the parties, Oklahoma law has no application to the present case. The one case that CSC cites in its Memorandum of Law that is not readily distinguishable from the present matter, *Crow–Crimmins–Wolff & Munier v. County, Etc.*, 90 A.D.2d 785, 455 N.Y.S.2d.390, 391 (2d Dep't 1982), can no longer be good law in New York in light of *Sargent* because *Crow–Crimmins* allowed contribution based upon a contractual relationship between two of the parties. In the unlikely event that it might still be good law, its reasoning is rejected as unpersua-

sive in light of the subsequent statements by the highest New York court. CPLR § 1401 is only applicable to tortfeasors seeking contribution, not those who are alleged to have breached a contract.

**5.** Because this disposes of the issue of whether CSC may seek contribution from Newman under New York law, this Court will not reach the issue of whether CM's complaint essentially sounds in contract.

**6.** *E.g.*, both the architectural firm and the general contractor had contracted separately with the school district; Newman and CSC each contracted separately with CM. Each case also involved complaints based on contractual relationships but including fraud counts, and third-party complaints invoking New York's contribution statute.

N.Y.S.2d 382, 282 N.E.2d 288 (1972) (codified by section 1401), the *Sargent* Court concluded that purely economic loss resulting from a breach of contract did not constitute "injury to property" under New York's contribution statute and that the statute should not be extended beyond tort so to also include contribution based upon contractual liability.

"To permit apportionment of liability, pursuant to CPLR 1401, arising solely from breach of contract would not only be at odds with the statute's legislative history, but also do violence to settled principles of contract law which limit a contracting party's liability to those damages that are reasonably foreseeable at the time the contract is formed * * *." 71 N.Y.2d at 28, 523 N.Y.S.2d 475, 517 N.E.2d 1360. The Court buttressed its position by noting that the statute defined " 'injury to property' as 'an actionable act, whereby the estate of another is lessened, other than a personal injury, *or the breach of a contract* ' (emphasis added)." *Id.* at 28 fn. 2, 523 N.Y.S.2d 475, 517 N.E.2d 1360 quoting from section 25–b of New York's General Construction Law ("GCL"). Thus, contribution was not available to Sargent (the architectural firm) against Thompson (the general contractor) because the school's damages were essentially contractual as they related to Thompson. *Id.* at 26–29, 523 N.Y.S.2d 475, 517 N.E.2d 1360. The Court also noted that, although the contribution statute was applicable to "breach of warranty" cases involving a defective product that caused physical injury, such cases were properly characterized as based in both tort and contract. Because *Sargent* involved a contractual relationship without an injury to person or property, it could not possess such duality. *Id.* at 28 fn. 2, 523 N.Y.S.2d 475, 517 N.E.2d 1360. *See also Schiavone, supra; Seely v. White Motor Co.,* 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965) (expressing the now-widely adopted view that tort remedies are not available in the commercial setting when economic loss absent physical injury is at issue); *Sommer v. Federal Signal Corp.,* 79 N.Y.2d 540, 552, 583 N.Y.S.2d 957, 593 N.E.2d 1365 (1992) (discussing the factors New York courts have used to determine whether an action sounds in either contract or tort).

Within this context, CSC has raised a factual dispute as to Newman's potential liability to CM and, for the purposes of this motion, this dispute is resolved in CSC's favor. Nonetheless, the dispute is not material because any such liability cannot be characterized as arising out of tort. By no stretch of this Court's reasoning or conjecture may Newman—a computer consultant contractually retained by CM to design the hardware and software of the computer control board, to produce a working prototype of a hoist and to attempt later to work out the alleged difficulties with the UMC chip—be considered a tortfeasor. Any lapse in performance on his part could only be redressed via a contract action—even with regard to the June 1984 trip to Taiwan or the troubleshooting role he played after he had fulfilled his obligations under the original contract. His relationship with CM remained contractual and any breach of duty to CM could only be considered a breach of contract. Indeed, CSC not only fails to allege any *specific* breach of duty, but also fails to allege any breach of duty that would involve an extra-contractual duty. Further, any injury he may have caused CM would be mere economic injury which does not qualify as an injury to property under New York law. *See* GCL § 25–b; *Schiavone,* 81 A.D.2d 221, 439 N.Y.S.2d at 937–940. CSC does not present any material facts creating a genuine issue in this regard either.

This conclusion is buttressed by the reasoning of the United States Court of Appeals for the Second Circuit in *Morse/Diesel III, supra,* 859 F.2d at 249–250. That case involved third-party claims filed by various subcontractors against other subcontractors and sub-subcontractors, based on theories of third-party beneficiary and contribution, with the latter being relevant to the present discussion. The third-party plaintiffs in that case claimed that, despite the fact that the obligations between the parties were contractual in nature, "the third-party defendants were negligent in failing to perform these obligations with due care, and are accordingly liable for contribution as tortfeasors under New York law." *Ibid.* The Court rejected this contention outright, restating the posi-

tion of New York's Court of Appeals—*viz.*, that merely couching a complaint in tort language will not convert a breach of contract action into a tort claim. *Id.* at 250 (citing *Sargent, supra,* and *Clark–Fitzpatrick v. Long Is.,* 70 N.Y.2d 382, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987)). The federal appellate court thereafter remanded the case to the district court with directions to dismiss the claims for failure to state any claims upon which relief could be granted. 859 F.2d at 250. Here, as there, any obligation third-party defendant Newman allegedly failed to perform was "essentially contractual in nature." *Ibid. See* Newman Affidavit, ¶¶ 1–6, 10, 14, 18 & Exhibits A–D; Complaint ¶¶ 7, 40; Answer ¶ 7; CSC's Memorandum of Law at 2, 4; Brady Affidavit at Exhibit A, p. 39, and at Exhibit C, pp. 91–93, (all discussing the relationship between Newman and CM, with the last-cited reference specifically and explicitly explaining the contractual nature of the relationship). This contractual relationship does not provide a basis for contribution under New York law; thus CSC has failed to state a claim upon which relief could be granted.[7]

In 1992, New York's Court of Appeals further elucidated the distinction between claims based upon contract and those based upon tort, and how such a distinction affected the law of contribution. In *Sommer, supra,* the Court held that defendant Holmes Pro-

tection, a fire alarm company, could be found liable to other defendants for contribution in a suit by the owner of a building against all of the defendants to recover for property damage due to fire.[8] The Court rejected Holmes Protection's contention that its obligations to the landlord and the other defendants were solely contractual and that the opinion in *Sargent* put it beyond the reach of the contribution statute. *Id.* 71 N.Y.2d at 557, 523 N.Y.S.2d 475, 517 N.E.2d 1360. Most relevant to the present case, *Sommer* identified the two controlling factors that New York courts rely on to separate contract from tort—(1) whether or not there is a public policy imposing a legal duty as an incident to and independent of the contractual relationship, and (2) the nature of the injury. *Id.* at 550–552, 523 N.Y.S.2d 475, 517 N.E.2d 1360.[9] Pursuant to this first factor, the Court noted that professionals, common carriers and bailees may be subject to tort liability for failing to exercise reasonable care, irrespective of their contractual duties. *Id.* at 551–552, 523 N.Y.S.2d 475, 517 N.E.2d 1360. By like reasoning, Holmes Protection not only had the duty to perform its contractual duties, but the nature of its services and of its relationship with its customers also implicated a significant public interest, thereby imposing a duty of reasonable care independent of its contracts. *Id.* at 552–553, 523 N.Y.S.2d 475, 517 N.E.2d 1360.[10] *Sommer*

7. It also would not support a claim for negligent performance of services which, prior to *Sargent, supra,* might have allowed this Court to characterize Newman as an alleged tortfeasor (for the purposes of contribution) if his contract could be characterized as one for services. *Compare Morse/Diesel, Inc. v. Trinity Industries, Inc.* ("*Morse/Diesel II*"), 664 F.Supp. 91, 95 (S.D.N.Y.1987) (on reargument, the trial court held that a claim for negligent performance of services could be sustained even though only economic damages were sought), *with Morse/Diesel III,* 859 F.2d at 249–250 (rejecting claim that third-party defendants were negligent in failing to perform contractual obligations with due care and thus liable for contribution). "Any obligations which the third-party defendants failed to perform here were essentially contractual in nature. Such failure does not provide a basis to impose liability for contribution under New York law." 859 F.2d at 250.

8. The landlord had contracted with Holmes Protection which allegedly had thereafter failed to heed a fire alarm at the apartment and to transmit the alarm to the fire department. 79 N.Y.2d at 548, 583 N.Y.S.2d 957, 593 N.E.2d 1365. Among the many ensuing lawsuits, the landlord sued Holmes as well as others connected with the alarm system. *Id.* at 549, 583 N.Y.S.2d 957, 593 N.E.2d 1365.

9. The court also rejected the distinction between nonfeasance (nonperformance) and misfeasance (improper performance) as purely semantic and not controlling as to whether an action sounded in contract or tort. Thus, CSC's attempts to label Newman as a misfeasant (and thus a tortfeasor) are unavailing.

10. In this regard, *Sommer* seems to place much reliance on New York City's comprehensive scheme of fire-safety regulation, which imposed various duties upon Holmes above and beyond its contractual undertakings. *Ibid.*

also allowed other defendant alarm entities to seek contribution because of the nature of the injury to the property owner—a fire that had spread out of control causing extensive damage to the building. *Id.* at 557, 523 N.Y.S.2d 475, 517 N.E.2d 1360. This injury obviously qualified as an injury to property, separate and above mere benefit-of-the-bargain damages available in a contract action. Another justification for allowing the contribution claim to proceed was that the injury was also caused by a fire—an "abrupt, cataclysmic occurrence," more familiar to tort law than contract. *Id.* at 552, 523 N.Y.S.2d 475, 517 N.E.2d 1360.

Under the cursory allegations of CSC's Third–Party Complaint, as expounded upon in its Memorandum of Law, it is obvious that CSC is merely employing language familiar to torts in an attempt to characterize the alleged breach of duty by Newman to CM as tortious rather than contractual. In order to prove negligence and withstand a motion of summary judgment, CSC would have to show that Newman owed CM a cognizable duty of care, that he breached that duty and that CM's damages were the proximate result of that breach. *See Morse/Diesel, Inc. v. Trinity Industries, Inc.* (*"Morse/Diesel I"*), 655 F.Supp. 346, 356 (S.D.N.Y.1987), *rev'd on other grounds, Morse/Diesel III, supra.* Again, assuming for the purposes of this motion that Newman did in fact breach a duty to CM and that this breach was the proximate cause of CM's damages, a review of CSC's allegations and supporting evidence still shows that CSC cannot overcome the two hurdles mentioned earlier. First, the duty in this instance is not cognizable as a duty imposed in tort; it arises solely out of the contract. Second, CSC fails to assert or substantiate that CM suffered any damages

beyond mere economic injury due to Newman's breach.

With regard to the relationship between Newman and CM, CSC alleges that it involved basically three overlapping series of events. The first part of the relationship involved Newman's design of the computer control board and the software for the Intel 8049 chip and the delivery of the prototype hoist. The second surrounded the hunt for a viable alternative chip after it was discovered that Intel would not supply CM. The third involved Newman's attempts to rectify the problems that arose in either the control board as a whole (CSC's interpretation of the Complaint) or the UMC chip itself (Newman's interpretation).[11]

■ With regard to this first phase of the relationship, Newman did indeed design the computer control board and its various components and accompaniments, but this was a contractual duty. Other than its brief allegation of negligence, malpractice and the like, CSC's Memorandum of Law and the Brady Affidavit offer no basis for, and often contradict, such an allegation. CSC also asserts that CM *relied* upon Newman's *expertise* in selecting the original microprocessor, in an apparent attempt to construct some type of malpractice claim, but this too must fail as a matter of law. Not only does CSC not dispute the existence of the CM–Newman contractual relationship, references to such relationship are found throughout its third-party papers. *See* Complaint ¶¶ 7, 40 and Third–Party Complaint, Exhibit C; Answer ¶ 7 and Third–Party Complaint, Exhibit D; CSC's Memorandum of Law at 2, 4; Brady Affidavit at Exhibit A, p. 39, and Exhibit C, pp. 91–93. There is no basis in law for extending the doctrine of professional malpractice to cover independent computer consultants. To

---

**11.** The Complaint appears to focus on the injuries caused primarily by the defective chip, but also alleges injuries caused by flaws in the control board itself. It repeatedly alleges that CSC breached the agreement by supplying "control boards which contained numerous flaws, including a microprocessor which, in violation of the agreement, was not the equivalent to the Intel 8049." *See* Complaint at ¶ 18 (Exhibit C to Third–Party Complaint). *See also, e.g., id.* at ¶¶ 22, 27, 30, 33, 35, 38, 39, 42 and 43. Thus, while the Complaint does mention flaws in the

control board, it appears that this is collateral to the injuries caused by the defective chip. This is relevant to the current motion because during oral argument Newman contended that the Complaint alleges injuries due solely to the defective chip, and thus that Newman could not be liable under New York's contribution statute because he was not responsible for the "same injury" as was CSC, having had nothing to do with the manufacture of the chip. The Court need not and does not reach this issue.

lift the theory of malpractice from its narrow origin of personal, professional services to a lay patient or client and apply it to the law of commercial contracts would obfuscate the necessary boundaries of these two areas of law. *Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737, 745 (2d Cir.1979) (rejecting application of malpractice statute of limitations to a commercial relationship). Thus, *Taft v. Shaffer Trucking, Inc.*, 52 A.D.2d 255, 383 N.Y.S.2d 744, 747 (4th Dep't 1976), and *Corva v. United States Auto. Ass'n*, 108 A.D.2d 631, 485 N.Y.S.2d 264, 265 (1st Dep't 1985),—which were relied on by CSC in support of its position—are both easily distinguished in that they dealt with the potential liability of a plaintiff's attorney to the defendant tortfeasor under the theory of contribution. No additional duty above and beyond his contract may be imposed upon Newman under the facts of this case. *Cf., AT & T v. New York City Human Resources Admin.*, 833 F.Supp. 962, 984 (S.D.N.Y.1993).

CSC alleges that CM's reliance on Newman extended to the latter's advice on the selection of alternate manufacturers—the second phase of the CM–Newman relationship. However, such advice is irrelevant, not only because of the nature of the CM–Newman relationship, but also because there is no allegation that Newman recommended either CSC or UMC to CM. It appears that Newman had not had any contact with CSC until after CM had selected it as its supplier. Even if Newman had, this Court is still left with merely a contractual relationship. Even if he breached some type of duty to CM during his June 1984 trip to Asia, by not discovering that UMC was not an Intel licensee or that the chips had an intolerance to electrical "noise," this was still undertaken pursuant to the contractual relationship with CM, unsupported arguments to the contrary notwithstanding. Thus, with regard to this phase of the relationship, CSC also fails to make any allegation or to present material facts alluding to a breach of duty above and beyond the contractual relationship.

Finally, with regard to the third phase of the CM–Newman relationship—the after-the-fact troubleshooting Newman under-took—the same reasoning as above applies. The relationship was contractual; CSC has not created a genuine issue of material fact to the · contrary.

Maintaining this important distinction between the realms of tort and contract is also not undermined by the nature of the injury allegedly suffered by CM at the hands of Newman. There are no material facts creating a genuine issue whether Newman's design, the prototype and his other activities caused CM to suffer an injury to person or property. Unlike the property owner in *Sommer, supra*, there is no evidence that CM suffered any damage to property due to Newman's alleged breach of duty. CSC did not even allege such. Further, this breach of duty did not result in any type of accident or cataclysmic occurrence similar to the fire in *Sommer*.

Furthermore, with regard to all phases of the CM–Newman relationship, public policy does not warrant the imposition of a duty upon Newman to exercise reasonable care independent of his contractual duties. Primarily, this is so because of the nature of his services—an unincorporated consultant engaged in the rather impersonal and relatively unregulated (compared to many other industries) field of computer design. *Cf., Sommer, supra* (fire safety heavily regulated). Also, the nature of his relationship with CM was arms-length and, while he may have been vested with a certain degree of responsibility, his duties were not affected by any significant public interest. If liability exists, it is purely contractual. Actually, public policy weighs against allowing tort liability considerations to interfere with the ordering of private contractual relationships in many instances, this being one of them. *See, e.g., East River S.S. Corp. v. Transamerica Delaval*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986) (declining to extend tort liability to a contractual relationship). Tort law is premised primarily on the public policy of making the injured party whole, while contract law is meant to facilitate primarily economic exchange and is premised upon the ordering of private affairs by the parties involved. *Carmania Corp, N.V. v. Hambrecht Terrell Intern.*, 705 F.Supp. 936, 938

(S.D.N.Y.1989). To infuse the current controversy with tort law, allowing it to further encroach upon private bargained-for relationships, would only upset the necessary order and predictability upon which the business world relies. *Sargent, supra,* 71 N.Y.2d at 28–29, 523 N.Y.S.2d 475, 517 N.E.2d 1360; *Sabetay v. Sterling Drug, Inc.,* 69 N.Y.2d 329, 336, 514 N.Y.S.2d 209, 506 N.E.2d 919 (1987) ("stability and predictability in contractual affairs is a highly desirable jurisprudential value"); *Schiavone, supra,* 81 A.D.2d 221, 439 N.Y.S.2d at 938–940.

It should also be noted that this result does not emburden CSC with the harsh consequence of having to assume liability for which it might not be responsible. It has asserted in its Answer the affirmative defenses that (1) CM or its agents were responsible for the defects in the computer boards, (2) CM failed to mitigate its damages and (3) the computer board design and the software components of the computer chip were the responsibility of CM. Answer at ¶¶ 49–51. Thus, CSC may still attempt to establish that CM or its agents were responsible for the defects in the board, the board design and the software, and that this was at least the partial cause of CM's damages.[12] CSC can therefore be held liable only for the damages it is found to have caused.

Based on the foregoing, this Court concludes that, as a matter of law, Newman's duty to CM was solely contractual. CSC has failed to present any material facts creating a genuine issue to the contrary and thus, it cannot sustain a claim for contribution.

Because there was no contract to indemnify and because CSC must be found at least partially at fault to incur any liability, there is no basis for allowing third-party plaintiff CSC to pursue its claim for indemnification against third-party defendant Newman. Further, because (1) CM's alleged injury at the hands of Newman was not alleged to be an injury to person or property, (2) CM and Newman had a commercial relationship and (3) there is no basis for imposing an independent legal duty upon Newman, CSC's claim for contribution against Newman must also be dismissed.

Accordingly, it is hereby **ORDERED** that third-party defendant Newman's motion for summary judgment dismissing CSC's third-party complaint is granted.

---

**12.** Indeed, in the Complaint CM refers to Newman as its "announced agent and representative." Complaint ¶ 40.